UNITED STATES DISTRICT COURT FOR THE DISCTRICT OF COLUMBIA

SOHEILA JANGJOO
6159 Roxbury Avenue
Springfield, VA 22152

and

ARDAVAN ROOZBEH
11920 Shagbark Drive
Rockville, MD 20852

     *Plaintiffs,*

  *vs.*

BROADCASTING BOARD OF
GOVERNORS
330 Independence Ave, SW
Washington DC 20237

and

SETAREH DERAKHSHESH SIEG
330 Independence Ave, SW
Washington DC 20237

    *Respondents.*

Civil Action No. _____

## **COMPLAINT**

### **Nature of the Action**

1. The Broadcasting Board of Governors ("BBG"), a United States federal agency,
   and the individual defendant, Ms. Setareh Derakhshesh Sieg, a BBG employee,
   are responsible for informing, engaging, and connecting people around the world
   in support of freedom and democracy.

2.  Defendants used their power and authority to maliciously punish Plaintiffs, Soheila Jangjoo and Ardavan Roozbeh, Purchase Order Vendors ("POV") and *de facto* employees of BBG, for exercising their right to freedom of speech under the First Amendment of the United States Constitution.

3.  Defendant Sieg personally retaliated against and punished Plaintiff Jangjoo for exercising her right to freedom of speech by ordering a reduction in her work assignments. In addition, Defendant Sieg made it impossible for Plaintiff Jangjoo to perform her contractual duties by barring her from entering the BBG headquarters. These actions resulted in the *de facto* termination of Plaintiff Jangjoo's employment contract with BBG.

4.  Defendant Sieg retaliated against Plaintiff Roozbeh for his exercise of freedom of speech and whistleblowing by terminating his employment contract with BBG.

5.  Defendants also violated Plaintiff Roozbeh's right to freedom of speech by coercing him to sign a letter consenting to the administrative closure of his contract and to waive his right to file a legal action against the Agency.

6.  Defendant BBG condoned, facilitated and implemented Defendant Sieg's retaliatory decisions resulting in significant damage to Plaintiffs.

7.  Defendants' actions violated Plaintiff Jangjoo and Roozbeh's right to freedom of speech under the First Amendment of the United States Constitution.

8.  The manner in which Defendants terminated Plaintiffs Jangjoo and Roozbeh's employment contracts violated their due process rights under the Fifth Amendment of the United States Constitution.

## Jurisdiction & Venue

9.  This case arises under the Constitution and laws of the United States and presents a federal question within the Court's jurisdiction under 28 U.S.C. § 1331.

10. Venue is proper in this judicial District under 28 U.S.C. § 1391(b) & (e).

## Parties

11. Plaintiff, Soheila Jangjoo, is a Permanent Resident of the United States, who was born in Iran. Ms. Jangjoo resides in Virginia. She served as a POV and a *de facto employee* of BBG's Persian language service, Persian News Network ("PNN"). She worked for PNN from April 2012 until November 2015 when, in retaliation

for exercising her right to freedom of speech, she was banned from performing her contractual duties, and thus was effectively terminated.

12. Plaintiff, Ardavan Roozbeh, is a Permanent Resident of the United States, who was born in Iran. Mr. Roozbeh resides in Maryland. He served as a POV and a *de facto* employee of BBG's Persian language service, PNN, from November 10, 2014 until August 24, 2015 when his contract was wrongfully backdated and effectively terminated.

13. Defendant BBG is a federal agency charged with overseeing all US government and government-sponsored, non-military, international broadcasting.

14. Defendant, Setareh Derakhshesh Sieg, is a Citizen of the United States, who was born in Iran. Ms. Sieg resides in Maryland. She is the Director of PNN. She is sued in her individual capacity for ordering, condoning and participating in the retaliatory and discriminatory actions alleged herein.

## Common Facts

15. Defendant BBG's mission is to inform, engage and connect people around the world in support of freedom and democracy. More specifically, Voice of America, one of BBG's networks, produces popular news, information and cultural programs in 45 languages. One of these languages is Persian. The VOA Persian Service also known as PNN is directed towards the people of Iran and Persian-speakers in furtherance of BBG's mission.

16. PNN has various shows and news programs that are produced, edited and hosted by federal employees and Purchase Order Vendors.

17. One of PNN's most popular TV shows is named *Ofogh*. This is an informational program, which is conducted in a talk show format where the host interviews one or more scholars and provides news analysis.

18. Mr. Siamak Dehghanpour, a US federal employee, and one of PNN's most respected and renowned figures was the host and the managing editor of *Ofogh*.

19. Mr. Dehghanpour is known as the icon of *Ofogh*, and many viewers watch the show because of his credibility, knowledge and professionalism.

20. From March 30, 2015 until April 2, 2015, a series of acts of mismanagement and miscalculations by PNN's management team resulted in a disagreement between Mr. Dehghanpour and PNN's management team, *in particular,* Defendant Sieg.

21. Consequently, as a form of disciplinary action, Defendant Sieg removed Mr. Dehghanpour from his hosting duties. She assigned him to perform tasks that are routinely performed by individuals at a much lower pay grade; therefore, not utilizing Mr. Dehghanpour's talent and agency resources efficiently.

22. Mr. Dehghanpour's removal from *Ofogh* damaged the show's programming and resulted in the dissatisfaction of its viewers.

23. Around July 2015, a few distinguished scholars and public figures created a petition on change.org in order to express concern regarding Mr. Dehghanpour's removal and to ask for his reinstatement as the host of *Ofogh*.

24. The petition was widely circulated and signed by Mr. Dehghanpour's fans and PNN's viewers.

25. The petition did *not* have an entry where petitioners would have to identify their professional affiliation or position.

26. Despite Defendant Sieg's animosity towards Mr. Dehghanpour, Plaintiffs kept their personal relations with him and held him in high esteem.

27. Consequently, Defendant Sieg abused, harassed, and infringed upon Plaintiffs' First Amendment rights in connection with Mr. Dehghanpour's removal from *Ofogh* and other events surrounding this incident.

### Facts Specific to Plaintiff Jangjoo

28. Plaintiff Jangjoo was a POV, also commonly known as an independent contractor, of BBG's Persian language service, PNN, from April 2012 until November 2015.

29. Plaintiff Jangjoo entered into a contract with BBG in April 2012 to provide her services as a Chyron/Teleprompter Operator.

30. Around March 2015 her contract was modified so that she provided her services as a Writer/Researcher/Reporter/Producer. Plaintiff Jangjoo served in this capacity until November 2015 when she faced retaliation, was banned from performing her job duties, and therefore, was effectively terminated.

31. Plaintiff Jangjoo did not serve a confidential, policy making or public contact role.

32. For the majority of her time at PNN, Plaintiff Jangjoo was given 18 assignments per month. Each assignment was equivalent to one 8-hour workday.

33. During her employment at PNN, Plaintiff Jangjoo worked on different shows including *Rooye Khat* and *Khiabane Zendegi*.

34. In April 2015, Mr. Dehghanpour's removal from *Ofogh* became a known fact to the public and to PNN's employees, including Plaintiff Jangjoo.

35. Many viewers began criticizing Defendant Sieg personally for Mr. Dehghanpour's removal. Defendant Sieg became extremely unsettled by these criticisms.

36. Defendant Sieg became so upset by the criticisms that on a number of occasions she ordered PNN staff to remove statements and comments from PNN's social media outlets that criticized her personally, inquired about Mr. Dehghanpour, and those that requested his return to *Ofogh*.

37. Meanwhile, an online petition was widely circulated to request Mr. Dehghanpour's reinstatement as the host of *Ofogh*.

38. Plaintiff Jangjoo, as a private citizen, signed this petition, which addressed a matter of public concern.

39. Around August 2015, shortly after Plaintiff Jangjoo signed the petition, Mr. Ebrahim Biparva, a PNN employee, told Plaintiff Jangjoo that he had good and bad news for her. He first informed her that he was going to be her supervisor. However, he also informed her that Defendant Sieg had decreased her assignments from 18 to 10 assignments per month, resulting in a substantial reduction of her work hours.

40. Plaintiff Jangjoo objected to the reduction in her assignments, as it would cause her significant financial damage.

41. The next day, Plaintiff Jangjoo spoke to Ms. Cheryl Nixon at the Contracting Office about the reduction of her assignments. However, Ms. Nixon informed her that it was Defendant Sieg's decision to reduce her assignments and that she could not do anything about it.

42. Plaintiff Jangjoo also went to see Ms. Tisha Elliot, a Human Resources Specialist at BBG's Labor and Employee Relations Division. She asked Ms. Elliot whether there had been any changes in her work assignments. Ms. Elliot stated that she had no knowledge of any such change.

43. Next, Plaintiff Jangjoo decided to speak with Defendant Sieg directly to understand why she had decided to reduce her assignments.

44. Plaintiff Jangjoo emailed Defendant Sieg. However, Defendant Sieg did not reply to her email. Defendant Sieg had even stopped responding to Plaintiff Jangjoo's greetings, as they passed one another at work.

45. One day, Plaintiff Jangjoo got the opportunity to confront Defendant Sieg in the hallway. Plaintiff Jangjoo asked Defendant Sieg why she had decreased her assignments. Defendant Sieg told her that, "you went behind my back, and I no longer trust you." It was clear to Plaintiff Jangjoo that Defendant Sieg's statements were in reference to Plaintiff Jangjoo's signing of the petition in support of Mr. Dehghanpour.

46. Plaintiff Jangjoo responded that she signed the petition in her capacity as a private citizen. However, Defendant Sieg told her not to argue and that Plaintiff Jangjoo's assignments were going to be reduced to 10 per month regardless of what she said.

47. Plaintiff Jangjoo told Defendant Sieg that she signed the petition as a viewer of the show, and not as a contractor of BBG. Nevertheless, Defendant Sieg told Plaintiff Jangjoo that her decision was made. Defendant Sieg stated, "I gave you 10 assignments out of the kindness of my heart; otherwise you would not even have that." Defendant Sieg told Plaintiff Jangjoo to stop asking her to change her mind, before she took away the 10 assignments as well. Defendant Sieg told Plaintiff Jangjoo that she should at least stand by what she has already done.

48. Taken back by Defendant Sieg's statements, Plaintiff Jangjoo went to speak with Ms. Elliot again. During this meeting, Ms. Elliot's supervisor, Ms. Sheryl William-Jones, was also present. Plaintiff Jangjoo recounted Defendant Sieg's statements. Plaintiff Jangjoo asked Ms. Elliot again whether Defendant Sieg had sent her an email regarding Plaintiff Jangjoo's assignments. Ms. Elliot stated that

she had not. Plaintiff Jangjoo also inquired as to whether it was prohibited for her to sign the petition. Ms. William-Jones stated that she did not think it was prohibited, and that Ms. Sieg had most likely seen the signature as a personal attack. Ms. Elliot suggested to Plaintiff Jangjoo to speak with Mr. Jim Kennedy, PNN's Staff Director, to see what could be done.

49. Subsequently, Plaintiff Jangjoo spoke to Mr. Kennedy and informed him about the fact that Defendant Sieg was reducing Plaintiff Jangjoo's assignments because she had signed a petition in support of Mr. Dehghanpour. Mr. Kennedy told Plaintiff Jangjoo that Defendant Sieg is the Director of PNN and she has the authority to make this decision. Mr. Kennedy told Plaintiff Jangjoo that he could not do anything for her.

50. During this time, Defendant Sieg became distressed and occupied by her conflict with Plaintiff Roozbeh (see below); therefore, she failed to formally request a reduction of Plaintiff Jangjoo's assignments. As a result, Plaintiff Jangjoo continued to work 18 assignments per month.

51. On November 6, 2015, Defendant Sieg informed Mr. Nick Kalhor, Plaintiff Jangjoo's Contracting Officer's Representative (COR), that Defendant Sieg was reducing Plaintiff Jangjoo's monthly assignments.

52. Mr. Kalhor relayed this order to Plaintiff Jangjoo. He told her that this should have been done back in September 2015. He told Plaintiff Jangjoo that if you have already worked 10 assignments for this month do not show up to work tomorrow. However, at the time, Plaintiff Jangjoo had worked less than 10 assignments.

53. Plaintiff Jangjoo asked Mr. Kalhor to make the same statements and requests in writing. Consequently, on or around November 6, 2015, Mr. Kalhor sent Plaintiff Jangjoo an email to the same effect.

54. On November 12, 2015, in the morning, Plaintiff Jangjoo reported to the Contracting Office and inquired whether her number of assignments could be reduced in this manner. Mr. JR Hill, a BBG Contract Specialist, informed her, that they could not, and that he would talk to Mr. Biparva who supervised her at the

time. Plaintiff Jangjoo informed Mr. Hill that Defendant Sieg was retaliating against her because she had signed the petition regarding Mr. Dehghanpour.

55. On November 12, 2015, in the afternoon, Mr. Kaveh Adib, a producer at PNN who was going to serve as Plaintiff Jangjoo's supervisor, and Mr. Nick Kalhor asked to meet with her. In their meeting, Mr. Adib and Mr. Kalhor, both employees of Defendant BBG, informed Plaintiff Jangjoo that they had spoken to Defendant Sieg regarding the reduction of Plaintiff Jangjoo's assignments. However, Defendant Sieg refused to change her mind. Plaintiff Jangjoo was told that she could work 4 hours per day for 20 days per month. Plaintiff Janjgoo asked whether she could work 6 hours per day, so that she could use the rest of her time finding other employment. However, Mr. Adib refused Plaintiff Jangjoo's request.

56. Plaintiff Jangjoo became distraught and began crying. She expressed her feelings regarding the injustice of this action and the extreme hardship she expected to endure as a result of Defendant Sieg's retaliation.

57. Plaintiff Jangjoo got up to leave to get water. However, she was told that she could not leave the room without permission. Plaintiff Jangjoo remained distraught and their meeting finished soon after.

58. Upon the implementation of Defendant Sieg's decision to reduce Plaintiff Jangjoo's assignments, Plaintiff Jangjoo suffered from severe emotional distress and was referred to the BBG Security Office.

59. Defendant BBG's agents and employees were aware of the fact that Defendant Sieg was retaliating against Plaintiff Jangjoo by reducing the number of her assignments. However, they all condoned, facilitated and executed this decision, and worked in concert to manipulate the situation, further harming Plaintiff Jangjoo.

60. The next day, Plaintiff Jangjoo returned to work as usual. She had received an email from Ms. Karen Wright from BBG's Security Office requesting to meet with Plaintiff Jangjoo.

61. Plaintiff Jangjoo, believing that the Security Office was located across the street, left the BBG headquarters, where she worked. Unable to locate the Security

Office, Plaintiff Jangjoo realized that they were also located at the BBG
headquarters.

62. As Plaintiff Jangjoo returned to the BBG headquarters, her employee badge was
taken away.

63. Ms. Wright and Ms. Elliot met Plaintiff Jangjoo in the building lobby and took
her to Ms. Elliot's office.

64. During their meeting, Ms. Elliot informed Ms. Wright about the petition in
support of Mr. Dehghanpour, Plaintiff Jangjoo's signature, and the reduction in
her assignments.

65. Plaintiff Jangjoo was asked whether she had threatened to harm herself during her
meeting with Mr. Kalhor and Mr. Adib. She clarified her statements to Ms.
Wright and Elliot, and explained that her statements were merely an objection to
Defendant Sieg's unjust and retaliatory actions.

66. Plaintiff Jangjoo told Ms. Wright and Elliot that she never actually meant to hurt
herself and she had merely made a statement under severe emotional stress. She
very clearly denied having any suicidal inclinations.

67. Nevertheless, upon Ms. Elliot's request, Plaintiff Jangjoo was involuntarily taken
away in handcuffs and committed to the DC Department of Behavioral Health.
These actions were intentionally taken against Plaintiff Jangjoo in order to
discredit her reputation and her claim against Defendant Sieg.

68. Plaintiff Jangjoo was not given an explanation as to why she was being taken
away. Police officers walked her out of the BBG headquarters, handcuffed her,
and took her to the DC Department of Behavioral Health.

69. Plaintiff Jangjoo was held in handcuffs until the attending physician asked for
them to be removed.

70. Plaintiff Jangjoo's involuntarily commitment, detainment, and handcuffing have
severely traumatized her.

71. At the DC Department of Behavioral Health Plaintiff Jangjoo was thoroughly
examined. She was declared to be in a stable mental state and to not be either
suicidal or homicidal. At the time of examination, Plaintiff Jangjoo was merely

declared to be stressed, and no medical treatment was required. Plaintiff Jangjoo was released soon after.

72. After her release, Plaintiff Jangjoo followed up with Ms. Elliot regarding when she could go back to work. She was asked to wait for a few days. Shortly after, Plaintiff Jangjoo was told to come and gather her belongings.

73. Plaintiff Jangjoo was deceived and made to believe that her employment contract with BBG had been terminated.

74. Plaintiff Jangjoo was never given an official termination letter or an explanation as to why she was asked to gather her belongings, indicating that she could no longer work for BBG.

75. To date, BBG officials maintain that the Contracting Office never terminated Plaintiff Jangjoo's contract, but rather she was banned from entering the BBG headquarters, and that is why she could no longer perform her job duties.

76. There has been no clear response as to why Plaintiff Jangjoo was banned from entering the BBG headquarters and why her badge was taken away given that she was declared to be in a stable mental state and not a threat to anyone.

77. Plaintiff Jangjoo had informed various BBG officials that her assignments were being reduced in retaliation for her exercise of her First Amendment right to free speech under the United States Constitution. However, no corrective or protective actions were taken. Defendant BBG condoned and facilitated Defendant Sieg's retaliatory actions that violated Plaintiff Jangjoo's constitutional rights.

78. Plaintiff Jangjoo's contract was *de facto* terminated short of its actual expiration date of February 28, 2016 due to Defendants' willful, malicious and retaliatory actions.

79. Defendants' actions have caused Plaintiff Jangjoo physical, emotional, mental and financial damage.

**Facts Specific to Plaintiff Roozbeh**

80. Plaintiff Roozbeh was a POV, also commonly known as an independent contractor, of BBG's Persian language service, PNN. Plaintiff Roozbeh entered

into a contract with BBG on November 10, 2014 and provided his services until August 24, 2015.

81. Plaintiff Roozbeh's contract designated him as a Social Media Reporter. However, he was frequently referred to as a "Social Media Administrator."

82. Plaintiff Roozbeh did not serve a confidential, public policy, or public contact role.

83. During his employment at PNN, Defendant Sieg repeatedly abused and pressured Plaintiff Roozbeh. In doing so Defendant Sieg committed waste and interfered with Plaintiff Roozbeh's business relations. For example, Plaintiff Roozbeh as the Social Media Administrator was brought on to promote PNN and improve its social media presence. To this end, he created an Instagram account for PNN. This is a very common practice among various small and large media outlets. Initially, Defendant Sieg became very upset and began admonishing Plaintiff Roozbeh for creating the account. Soon after, she realized that having an Instagram account was necessary for being a competitive news agency.

84. Realizing the efficacy of Instagram, Defendant Sieg used the account for self-promotion. She repeatedly pressured Plaintiff Roozbeh to upload pictures of herself and her videos on Instagram. In this process, she also frequently attacked Plaintiff Roozbeh and ordered him to delete pictures of her where her facial wrinkles were showing.

85. Furthermore, on multiple occasions, Plaintiff Roozbeh uploaded pictures on Instagram that were already previewed and approved by Mr. Mohammad Manzarpour, his immediate supervisor. However, Defendant Sieg would order him to remove the pictures, and criticize him for uploading them. During this time much of Plaintiff Roozbeh's time was wasted on uploading and deleting Instagram content, and responding to Defendant Sieg's abusive remarks as she and Mr. Manzarpour could not arrive at a consensus. Defendant Sieg used Plaintiff Roozbeh as her instrument to commit waste, and in doing so she purposefully interfered with Plaintiff Roozbeh's ability to fulfill his professional obligations.

86. In addition, Defendant Sieg harassed Plaintiff Roozbeh to publicize her work on other social media outlets such as Facebook. For example, she continuously

harassed Plaintiff Roozbeh to upload her pictures and videos on Facebook. In one instance, she became angry with Plaintiff Roozbeh as to why the clip for her interview with Secretary Kerry had only received 78 "likes."  Defendant Sieg's unreasonable and excessive demands were forcing Plaintiff Roozbeh to engage in government waste and to assist her in using federal government's resources in order to promote herself as an individual and to promote her own shows on PNN. These intentional demands interfered with Plaintiff Roozbeh's ability to fulfill his duties under the terms of his contract; thus, exposing him to the risk of losing his employment contract.

87. Furthermore, during the Iranian Nuclear Deal Negotiations, State Department's Persian Language Spokesperson, Mr. Alan Eyre, asked his followers on Facebook whether they thought PNN was a better news source or BBC Farsi. In response to his post, Mr. Eyre's followers heavily weighed in favor of BBC Farsi and criticized PNN. Finding that the responses predominantly favored BBC Farsi, Ms. Sieg panicked and became extremely angry. She ordered Mr. Mohammad Manzarpour to tell Plaintiff Roozbeh to find individuals, at whatever *cost*, to leave positive comments regarding PNN *and* herself on Mr. Eyre's Facebook post. In conveying this request to Plaintiff Roozbeh, Mr. Manzarpour told him that Defendant Sieg was extremely worried because these types of questions affect Congressional funding and PNN's reputation. As a result, Mr. Manzarpour begged Plaintiff Roozbeh to help out; however, Plaintiff Roozbeh found the demand appalling and refused to comply.

88.  In April 2015, when Defendant Sieg removed Mr. Dehghanpour from his hosting duties at *Ofogh*, Plaintiff Roozbeh still maintained his friendship with Mr. Dehghanpour. Defendant Sieg frowned upon this friendship and began to put extra pressure on Plaintiff Roozbeh as a result.

89. Around the same time, in April 2015, Ms. Cheryl Nixon, from BBG's Contracting Office, asked Plaintiff Roozbeh to meet her in Mr. Manzarpour's office. She informed Plaintiff Roozbeh that Defendant Sieg was upset with him and was dissatisfied with his work. Defendant Sieg was displeased with the fact that Plaintiff Roozbeh was allegedly not publishing social media updates quickly

enough. Plaintiff Roozbeh informed Ms. Nixon that social media is different than a regular website and bombarding the audience will frustrate them and cause the loss of followers. Therefore, Plaintiff Roozbeh explained to Ms. Nixon that he was in fact not delaying any posts or online submissions, but rather, by the virtue of his position as the Social Media Administrator, he was strategically working to ensure that PNN received the largest web following possible.

90. Ms. Nixon told Plaintiff Roozbeh that his last violation had to be addressed. She stated that the Sunday prior to their meeting, which took place on a Tuesday, Defendant Sieg had emailed Plaintiff Roozbeh at 6:30pm; however, Plaintiff Roozbeh had taken too long to respond to her. Plaintiff Roozbeh informed Ms. Nixon that in fact based upon the time stamps on their communications he had responded to Plaintiff Sieg at 6:37pm of the same day, and he did not understand how that could be interpreted as a delayed response. Consequently, Ms. Nixon stated that she did not know why Defendant Sieg had made such an accusation. However, Ms. Nixon refused to include Plaintiff Roozbeh's time-stamped email in the complaint folder showing that he had not committed any violations. She also refused to write down that Defendant Sieg's complaint was unfounded.

91. During this time, Defendant Sieg was facing much public backlash for her decision to remove Mr. Dehghanpour as the host of *Ofogh*.

92. In response to the ongoing criticisms from PNN's viewers, Defendant Sieg asked Plaintiff Roozbeh to log into *Ofogh's* Facebook account and delete comments that were directly criticizing her or those that were asking for Mr. Dehghanpour's return to *Ofogh*. In addition, she asked Mr. Manzarpour to hold a meeting with Plaintiff Roozbeh, Mr. Kaveh Adib, a Producer at PNN, and Ms. Aida Monfared, another POV, to order them to delete every comment, from PNN's social media outlets, that related to Mr. Dehghanpour. In both instances, Plaintiff Roozbeh stated that he would only delete comments that used obscene language, but he would not delete comments that were merely critical of Defendant Sieg or those that related to Mr. Dehghanpour. These orders were in violation of the VOA Charter and Journalistic Code and also potentially the US Constitution. Had Plaintiff Roozbeh consented to deleting the comments it could have resulted in the

termination of his contract. Plaintiff Roozbeh's refusal to infringe upon another individual's right to freedom of speech angered Defendant Sieg and further strained their relationship. Nevertheless, Defendant Sieg was able to force another POV to delete the aforementioned comments.

93. During this time, Defendant Sieg began to create unnecessary administrative red tape for Plaintiff Roozbeh. For example, in August 2015, Plaintiff Roozbeh needed to replace his press badge. The process for replacing a press badge is rather simple. However, Defendant Sieg intentionally picked on Plaintiff Roozbeh's application and his request process to retaliate against him. He was forced to modify and re-submit his application multiple times. After there were no more alleged issues with his application, Defendant Sieg denied Plaintiff Roozbeh's request for a press badge. She refused to provide him with any reasons for the denial. Defendant Sieg also ignored Plaintiff Roozbeh when he went to meet with her regarding the denial of his request.

94. The following day, Defendant Sieg went to New York and emailed Plaintiff Roozbeh inquiring about the identities of the managers for PNN's YouTube page. He responded in full detail. Defendant Sieg wrote another email asking him for the identities of the administrators for PNN's Google+ account. Plaintiff Roozbeh responded, providing Defendant Sieg with the required information. Again, Defendant Sieg asked a series of questions on minute details regarding the same matter, to which Plaintiff Roozbeh responded diligently. Her emails continued over the next three days that she was in New York. The emails served absolutely no functional purpose, but were rather a way to harass and micro-manage Plaintiff Roozbeh. In her last email, Defendant Sieg attacked Plaintiff Roozbeh regarding one of his responses, with an accusation that he did not know how to do his job.

95. On Friday, August 21, 2015, finding that Defendant Sieg was effectively preventing him from performing his duties, Plaintiff Roozbeh decided to voice his grievances to the VOA and BBG senior management by writing an email in form of a resignation letter. Consequently, Plaintiff Roozbeh sent an email to Mr. Manzarpour, his own supervisor, Ms. Kelu Chao, Defendant Sieg's supervisor, and Mr. Andre Mendez, BBG's interim CEO and Director, informing them of

Defendant Sieg's behavior and his reasons for resigning. He specifically addressed Defendant Sieg's abuse of authority, engagement in prohibited personnel practices and mismanagement.

96. In his email, Plaintiff Roozbeh also explicitly discussed Defendant Sieg's intentional interference with his performance of his contractual duties.

97. Plaintiff Roozbeh did not receive any responses to his email. Neither a rejection of his decision nor its approval.

98. On the following Monday, August 24, 2015, a colleague asked Plaintiff Roozbeh whether he had been terminated or he had resigned. The colleague stated that s/he was in Defendant Sieg's office and overheard Defendant Sieg asking her assistant to write a letter in order to terminate Plaintiff Roozbeh and to have security guards escort him out. As a result, in order to protect himself against potential misinformation, slander and libel, Plaintiff Roozbeh wrote a department wide email to the PNN staff. In this email he shared his decision to resign, and also his grievances with the mismanagement at PNN and particularly with Defendant Sieg's abusive behavior and interference with his contractual obligations.

99. Immediately after Plaintiff Roozbeh sent his email, Ms. Nixon came to Plaintiff Roozbeh's desk and asked him in an excessively aggressive manner to accompany her upstairs to the Contracting Office. Once there, she began yelling at him asking how dare he quit his contract.

100. Another gentleman that was present at the office interrogated Plaintiff Roozbeh regarding what he had said about Defendant Sieg in his resignation letter. Mr. Roozbeh asked him whether they were angry that he was resigning or whether they were angry about the content of his letter. Plaintiff Roozbeh was not given a response.

101. Then the gentleman present told Plaintiff Roozbeh that he would help him out; he stated that he would draft a letter requiring Plaintiff Roozbeh to waive his legal right to file a complaint against the Agency and in exchange the Agency would administratively close his contract. The administrative closure of his contract was the equivalent of being terminated.

102. Plaintiff Roozbeh was kept at the Contracting Office from approximately 9am-4pm until the letter was drafted. He was asked to sign it on the spot. Plaintiff Roozbeh refused to do so and asked for time to think about it until the next day.

103. While Plaintiff Roozbeh was at the Contracting Office, Defendant Sieg held a department wide meeting and announced to the PNN staff that Mr. Roozbeh had been terminated and that he was lying about the fact that he had resigned. Defendant Sieg retaliated against Plaintiff Roozbeh by smearing his reputation and misinforming her staff about the truth of the matter. During this meeting Defendant Sieg also threatened and told other PNN staff that if anybody filed a compliant with higher management against her, she would retaliate and act accordingly.

104. The following day, on August 25, 2015, Plaintiff Roozbeh went to the Contracting Office and stated that he would not sign any letters. In response, the gentleman who was also present the day before stated that "you have no right to resign, and if you do you will be sued. However, if you sign the letter then the Agency will not sue you." Plaintiff Roozbeh responded that if the Agency did not agree with his resignation letter, then he would go back to his desk and would continue working until the end of his contract. His contract was valid until November 09, 2015. However, Ms. Nixon adamantly told Plaintiff Roozbeh that he was not allowed to go back to work, and that he had to sign the letter. Plaintiff Roozbeh was not given a choice. If he signed the letter then he would have been terminated on the spot, and if he did not sign the letter he was still not allowed to go back to work. Plaintiff Roozbeh was effectively terminated.

105. Furthermore, the gentleman who was also present the day before, told Plaintiff Roozbeh that "you *will* sign the letter and then you will get out of here." Plaintiff Roozbeh again refused to sign the letter. The gentleman asked him why he was not signing it. Plaintiff Roozbeh responded that he could not sign the letter because he would certainly file a complaint against the Agency and the individuals involved. This led the gentleman to go to the General Council's office to seek advice. As soon as he returned, his tone changed. Plaintiff Roozbeh was told that he did not have to sign the letter and that he could go.

16

106. Soon after, Plaintiff Roozbeh received a revised version of his contract with the end date being modified to August 23, 2015. This was done in lieu of issuing him a termination letter.

107. The termination date of August 23, 2015 is highly troubling because all of the occurrences mentioned above took place on August 24 and August 25, 2015; and, August 23, 2015 was a Sunday. Had Plaintiff Roozbeh actually been terminated on August 23, 2015, he should not have been able to enter a federal government building and start his work on Monday, August 24, 2015. In addition, Plaintiff Roozbeh's last invoice was submitted on August 24, 2015 and was approved and signed by Mr. Manzarpour. More specifically, Plaintiff Roozbeh had worked in the early hours of August 24, 2015 and was paid for it. Therefore, Plaintiff Roozbeh's contract was not actually terminated on August 23, 2015; rather the date of his termination was backdated in order to protect Defendant Sieg and others involved in the incidents that occurred.

108. It should be noted that throughout his employment at PNN, Plaintiff Roozbeh's immediate supervisor, Mr. Manzarpour, had repeatedly expressed satisfaction with Plaintiff Roozbeh's performance of his duties. He even wrote him a stellar recommendation letter. Plaintiff Roozbeh's quality of work was not a reason for his termination.

109. In addition, Plaintiff Roozbeh's contract was valid until November 09, 2015, and there had been no official discussions regarding the termination of his contract prior to these incidents.

110. Nevertheless, Plaintiff Roozbeh was effectively terminated for exercising his First Amendment right to freedom of speech in criticizing Defendant Sieg and PNN's management, and in informing the VOA and BBG management of the abuses that occurred at PNN.

111. Defendants' actions have caused Plaintiff Roozbeh emotional and financial damage.

## COUNT I- VIOLATION OF PLAINTIFF JANGJOO'S FIRST AMENDMENT RIGHT BY DEFENDANT SIEG

112. Plaintiff Jangjoo incorporates by reference all prior paragraphs as if set forth in their entirety here.

113. Defendant Sieg's actions set forth above, individually and in concert jointly and severally with Defendant BBG, infringed upon Plaintiff Jangjoo's right to freedom of speech in violation of the First Amendment of the United States Constitution, by admittedly retaliating against and punishing Plaintiff Jangjoo for her personal beliefs, speech, and expression on a matter of public concern.

114. Defendant Sieg, individually and in concert jointly and severally with Defendant BBG, violated Plaintiff Jangjoo's First Amendment Right under the United States Constitution by ordering the retaliatory reduction of her assignments, by involuntarily committing her to a mental health institute, and by barring her from entering the BBG headquarters to perform her job duties, thereby effectively terminating her contract.

115. Defendant Sieg's actions were willful, malicious and taken in reckless disregard of Plaintiff Jangjoo's rights and were intended to and did cause her significant harm.

## COUNT II- VIOLATION OF PLAINTIFF JANGJOO'S FIRST AMENDMENT RIGHT BY DEFENDANT BBG

116. Plaintiff Jangjoo incorporates by reference all prior paragraphs as if set forth in their entirety here.

117. Defendant BBG, individually and in concert jointly and severally with Defendant Sieg, violated Plaintiff Jangjoo's First Amendment Right by allowing and facilitating the retaliatory reduction of her assignments, by involuntarily committing her to a mental health institute, and by barring her from entering the BBG headquarters to perform her job duties, thereby effectively terminating her contract.

118. Defendant BBG condoned and assisted Defendant Sieg's willful, malicious, and retaliatory behavior against Plaintiff Jangjoo in violation of her First Amendment right under the United States Constitution.

119. Defendant BBG violated Plaintiff Jangjoo's right to freedom of speech by failing to take necessary steps to prevent the reduction of Plaintiff Jangjoo's assignments when Defendant BBG knew that the reduction was in retaliation for Plaintiff Jangjoo's exercise of her freedom of speech.

120. Defendant BBG's actions were willful, malicious and taken in reckless disregard of Plaintiff Jangjoo's rights and were intended to and did cause her significant harm.

## COUNT III- VIOLATION OF PLAINTIFF JANGJOO'S FIFTH AMENDMENT RIGHT BY DEFENDANT SIEG

121. Plaintiff Jangjoo incorporates by reference all prior paragraphs as if set forth in their entirety here.

122. Under the Fifth Amendment of the United States Constitution no person shall be deprived of life, liberty or property without due process of law.

123. Defendant Sieg's prohibition of Plaintiff Jangjoo's entry into the BBG Headquarters violated her due process rights under the Fifth Amendment.

124. Defendant Sieg's retaliatory termination of Plaintiff Jangjoo's employment contract violated her due process rights under the Fifth Amendment.

125. Defendant Sieg's actions were willful, malicious and taken in reckless disregard of Plaintiff Jangjoo's rights and were intended to and did cause her significant harm.

## COUNT IV- VIOLATION OF PLAINTIFF JANGJOO'S FIFTH AMENDMENT RIGHT BY DEFENDANT BBG

126. Plaintiff Jangjoo incorporates by reference all prior paragraphs as if set forth in their entirety here.

127. Under the Fifth Amendment of the United States Constitution no person shall be deprived of life, liberty or property without due process of law.

128. Defendant BBG's prohibition of plaintiff Jangjoo's entry into the BBG Headquarters violated her due process rights under the Fifth Amendment.

129. Defendant BBG's retaliatory termination Plaintiff Jangjoo's employment contract violated her Fifth Amendment due process rights.

130. Defendant BBG's actions were willful, malicious and taken in reckless disregard of Plaintiff Jangjoo's rights and were intended to and did cause her significant harm.

## COUNT V- VIOLATION OF PLAINTIFF ROOZBEH'S FIRST AMENDMENT RIGHT BY DEFENDANT SIEG

131. Plaintiff Roozbeh incorporates by reference all prior paragraphs as if set forth in their entirety here.

132. Defendant Sieg's actions set forth above, individually and in concert jointly and severally with Defendant BBG, infringed upon Plaintiff Roozbeh's right to freedom of speech in violation of the First Amendment of the United States Constitution.

133. Defendant Sieg violated Plaintiff Roozbeh's First Amendment right by harassing and coercing him to waive his legal rights to file a complaint against the Agency.

134. Defendant Sieg retaliated against Plaintiff Roozbeh for his exercise of freedom of speech and whistleblowing by fraudulently backdating and terminating his employment contract with BBG.

135. Defendant Sieg retaliated against Plaintiff Roozbeh for his exercise of freedom of speech by intentionally spreading lies and misinforming PNN's staff about the status of his employment.

136. Defendant Sieg's actions were willful, malicious and taken in reckless disregard of Plaintiff Roozbeh's rights and were intended to and did cause him significant harm.

## COUNT VI- VIOLATION OF PLAINTIFF ROOZBEH'S FIRST AMENDMENT RIGHT BY DEFENDANT BBG

137. Plaintiff Roozbeh incorporates by reference all prior paragraphs as if set forth in their entirety here.

138. Defendant BBG, individually and in concert jointly and severally with Defendant Sieg, violated Plaintiff Roozbeh's First Amendment Right under the United States Constitution by terminating his employment contract and fraudulently backdating Plaintiff Roozbeh's termination date.

139. Defendant BBG condoned Defendant Sieg's willful, malicious, and retaliatory behavior against Plaintiff Roozbeh in violation of his First Amendment Right under the United States Constitution.

140. Defendant BBG violated Plaintiff Roozbeh's First Amendment Right by harassing and coercing him to waive his legal rights to file a complaint against the Agency.

141. Defendant BBG's actions were willful, malicious and taken in reckless disregard of Plaintiff Roozbeh's rights and were intended to and did cause him significant harm.

## COUNT VII- VIOLATION OF PLAINTIFF ROOZBEH'S FIFTH AMENDMENT RIGHT BY DEFENDANT SIEG

142. Plaintiff Roozbeh incorporates by reference all prior paragraphs as if set forth in their entirety here.

143. Under the Fifth Amendment of the United States Constitution no person shall be deprived of life, liberty or property without due process of law.

144. Defendant Sieg's termination of Plaintiff Roozbeh's employment contract violated his due process rights under the Fifth Amendment of the United States Constitution.

145. Defendant Sieg's actions were willful, malicious and taken in reckless disregard of Plaintiff Roozbeh's rights and were intended to and did cause him significant harm.

## COUNT VIII- VIOLATION OF PLAINTIFF ROOZBEH'S FIFTH AMENDMENT RIGHT BY DEFENDANT BBG

146. Plaintiff Roozbeh incorporates by reference all prior paragraphs as if set forth in their entirety here.

147. Under the Fifth Amendment of the United States Constitution no person shall be deprived of life, liberty or property without due process of law.

148. Defendant BBG's termination of Plaintiff Roozbeh's employment contract violated his due process rights under the Fifth Amendment of the United States Constitution.

149. Defendant BBG's actions were willful, malicious and taken in reckless disregard of Plaintiff Roozbeh's rights and were intended to and did cause him significant harm.

WHEREFORE, Plaintiffs request that this Court declare that Defendants have violated Plaintiffs' rights under the US Constitution, award plaintiffs consequential, compensatory and punitive damages in an amount to be proven at trial, award plaintiffs' costs and reasonable attorney fees incurred in this action, and award such other relief as the Court deems appropriate.

Respectfully submitted,

_____

Ali Herischi, Esq. (MD0024)
Herischi & Associates LLC
7201 Wisconsin Ave., Suite 450
Bethesda, Maryland 20814
Phone: 301-363-4540
Fax: 301-363-4538
*Attorney for Plaintiffs*