## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SOHEILA JANGJOO, *et al.*, | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 16-0870 (ABJ) |
| BROADCASTING BOARD OF GOVERNORS, *et al.*, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Plaintiffs Sohelia Jangjoo and Ardavan Roozbeh have sued the Broadcasting Board of Governors ("BBG"), an independent federal agency, and a BBG employee, Setareh Derakhshesh Sieg, in her individual capacity. Plaintiffs worked for BBG's Persian language service, the Persian News Network ("PNN"), which is a component of BBG's broader "Voice of America" network. First Am. Compl. [Dkt. # 14] ("Am. Compl.") ¶¶ 2, 17, 30, 82. Defendant Sieg is the Director of PNN, and had supervisory control over both plaintiffs. *Id.* ¶¶ 16, 51.

On April 2, 2015, PNN announced that the popular host of its show *Ofogh*, Siamak Dehghanpour, would be replaced. Am. Compl. ¶¶ 19–23. A public outcry followed. *Id.* ¶¶ 24–25. Supporters of Dehghanpour created a petition on "Change.org," demanding that he be reinstated. *Id.* ¶¶ 25–26. Plaintiff Jangjoo signed the petition. *Id.* ¶ 40. Plaintiff Roozbeh did not sign the petition, but he maintained a friendly relationship with Dehghanpour even after the network's decision. *See id.* ¶ 28. Plaintiffs allege that in retaliation for supporting Dehghanpour, and in violation of their First Amendment rights, Sieg and BBG fired them. *Id.* ¶ 29. They also allege that the terminations violated their Fifth Amendment rights to due process. *Id.* ¶¶ 128–40;

164–75.  They seek damages, and a declaratory judgment and injunction to remedy the alleged constitutional injuries.  *Id.* ¶¶ 141–50; 176–85.

Defendants have moved to dismiss in part.  While they do not challenge Counts I and III – plaintiff Jangjoo's First and Fifth Amendment claims against defendant Sieg, in her individual capacity – they move to dismiss the remaining counts.  Defs.' Mot. to Dismiss in Part &, in the Alternative, to Sever Pls.' Am. Compl. [Dkt. # 15] ("Defs.' Mot.") at 2.  Defendants argue that all of the claims against BBG – Counts II, IV, VI, and VIII – should be dismissed under Federal Rule of Civil Procedure 12(b)(1) because BBG, as a government entity, enjoys sovereign immunity.  *Id.* at 7–8.  And defendant Sieg moves to dismiss the claims brought against her by plaintiff Roozbeh (Counts V and VII) under Rule 12(b)(6), on the grounds that Roozbeh's First and Fifth Amendment claims fail to allege a plausible claim for relief.  *Id.* at 8–12.

Defendants also move to sever plaintiff Jangjoo's claims from those of plaintiff Roozbeh under Federal Rule of Civil Procedure 20, arguing that while the two plaintiffs shared a common employer and supervisors, their dismissals did not arise from the "same transaction, occurrence, or series of transactions or occurrences."  *Id.* at 12–13.

The Court will grant the motion to dismiss.  BBG is entitled to sovereign immunity, so all of the claims against it will be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1). With respect to plaintiff Roozbeh's claim in Count V that defendant Sieg infringed on Roozbeh's constitutional rights by forcing him to waive his right to file a complaint against the agency and by retaliating against him for making statements about her conduct as a manager, plaintiff has failed to plausibly allege a First Amendment violation because the statements at issue were made as part of his official duties as a BBG employee.  And with respect to plaintiff Roozbeh's allegation in Count VII that defendant Sieg violated his Fifth Amendment rights when she terminated his

employment with BBG, plaintiff Roozbeh likely lacks standing to pursue a claim against Sieg; he specifically alleges that he resigned, and therefore, his alleged injuries are not fairly traceable to defendant Sieg's conduct.  And even if plaintiff had standing, his procedural due process claim would fail on the merits.  Because the Court will dismiss all claims brought by plaintiff Roozbeh, it need not address defendant's motion to sever the claims of the two plaintiffs.

## BACKGROUND

To resolve the pending motion to dismiss, the Court accepts as true the allegations in plaintiffs' First Amended Complaint.[1]

Defendant BBG is an independent federal agency whose "mission is to inform, engage and connect people around the world in support of freedom and democracy."  Am. Compl. ¶ 17.  In pursuit of that mission, BBG operates several media outlets, including Voice of America, a multimedia network producing "popular news, information and cultural programs in 45 languages."  *Id.*  One foreign language subsidiary of Voice of America is PNN, which is "directed towards the people of Iran and Persian-speakers in furtherance of BBG's mission."  *Id.*

One of PNN's most popular programs is a show called *Ofogh*, an informational talk show formerly hosted by Siamak Dehghanpour.  Am. Compl. ¶¶ 19–20.  In late March and early April of 2015, a series of disagreements between Dehghanpour and PNN's management team culminated in PNN management removing Dehghanpour as the host of *Ofogh* on April 2, 2015.  *Id.* ¶¶ 22–23.  Because of Dehghanpour's popularity, *Ofogh* viewers began circulating a petition on Change.org expressing concern about his removal and calling for his reinstatement.  *Id.* ¶¶ 25–26.  Plaintiff Jangjoo signed this petition.  *Id.* ¶ 40.

---

1      The Court observes, though, that the 185-paragraph complaint is unnecessarily detailed and lengthy, and that it bears little resemblance to the "short and plain statement of the claim" called for by Federal Rule of Civil Procedure 8.

I.    **Plaintiff Jangjoo**

Plaintiff Jangjoo worked on several PNN programs as a Purchase Order Vendor ("POV") from April of 2012 to November of 2015, starting out as a "Chyron/Teleprompter Operator" and eventually rising to a "Writer/Researcher/Reporter/Producer" position.  Am. Compl. ¶¶ 31–32, 35.[2]  Jangjoo typically received 18 assignments per month, the equivalent of 18 full-time work days.  *Id.* ¶ 34.  But according to the complaint, after Jangjoo signed the Change.org petition, her supervisors, at Sieg's direction, reduced her workload to 10 assignments per month.  *Id.* ¶ 41. Since she was paid on a per-assignment basis, her overall pay was reduced.  *Id.* ¶ 42.

Plaintiff Jangjoo alleges she emailed Sieg directly to discuss the reduction in her assignments, but Sieg did not respond.  Am. Compl. ¶¶ 45–46.  Jangjoo's relationship with Sieg soured from there; Sieg even stopped responding to Jangjoo's greetings when they passed each other in the hallways of the office.  *Id.* ¶ 46.  Eventually, Jangjoo was able to speak with Sieg, who accused Jangjoo of going "behind [her] back."  *Id.* ¶ 47.  Jangjoo understood Sieg's accusation to be in reference to Jangjoo's signing of the Change.org petition.  *Id.*  Though plaintiff says that she told Sieg that she had signed the petition in her capacity as a private citizen, Sieg responded by

---

2    Though plaintiffs allege that they were independent contractors, Am. Compl. ¶¶ 30, 82, they also allege that they were "*de facto* employee[s] of BBG."  *Id.* ¶¶ 2, 13, 14.  The legal standards governing the distinction between independent contractors and employees are "decidedly unharmonious," *Lancaster Symphony Orchestra v. NLRB*, 822 F.3d 563, 565 (D.C. Cir. 2016), and "there is no shorthand formula or magic phrase that can be applied" to determine any particular worker's status.  *FedEx Home Delivery v. NLRB*, 563 F.3d 492, 496 (D.C. Cir. 2009), quoting *NLRB v. United Ins. Co.*, 390 U.S. 254, 258 (1968).  The D.C. Circuit has also concluded that certain BBG workers are independent contractors, not employees, for purposes of an employment discrimination claim.  *Khaksari v. Chairman, Broad. Bd. of Governors*, 451 F. App'x 1, 2 (D.C. Cir. 2011).  Because on a motion to dismiss the Court must accept as true all plausible allegations in plaintiffs' complaint, and because plaintiffs' status is not particularly germane to the resolution of the motion, the Court will accept as true the allegation that plaintiffs were BBG employees.

confirming that her assignments "were going to be reduced to 10 per month regardless of what she said," and that Jangjoo should stop asking Sieg to change her mind.  *Id.* ¶¶ 48–49.[3]

On November 12, 2015, plaintiff's immediate supervisors confirmed in a meeting that Sieg's decision would not be revisited, and that plaintiff's hours would be reduced.  Am. Compl. ¶ 57.  Plaintiff then became "distraught and began crying," and expressed to her supervisors "her feelings regarding the injustice of this action and the extreme hardship she expected to endure." *Id.* ¶ 58.  As she put it, "[u]pon the implementation of Defendant Sieg's decision . . . Plaintiff Jangjoo suffered from severe emotional distress and was referred to the BBG Security Office."  *Id.* ¶ 60.  Apparently, during the meeting, plaintiff made statements giving rise to the impression that she intended to harm herself, but she claims that she "clarified" those statements the following day when she arrived at work but was detained because she had not reported to the Security Office. *Id.* ¶¶ 62–67, 69.  She told the BBG supervisors she met with that day "that she never actually meant to hurt herself and she had merely made a statement under severe emotional stress."  *Id.* ¶ 68.  According to plaintiff Jangjoo, "[s]he very clearly denied having any suicidal inclinations." *Id.*

Nevertheless, Jangjoo was "involuntarily taken away in handcuffs and committed to the [District of Columbia] Department of Behavioral Health," and she alleges that step was taken in order to discredit her reputation and her complaints against defendant Sieg.  Am. Compl. ¶ 69. She was later discharged from the Department of Behavioral Health after being declared "to be in a stable mental state and to not be either suicidal or homicidal," but merely "stressed."  *Id.* ¶ 73.

---

3       Though plaintiff Jangjoo alleges defendant Sieg ordered the reduction in her assignments in August of 2015, Am. Compl. ¶ 41, she also alleges that the actual change in the number of her assignments did not occur until November of 2015, because "Sieg became distressed and occupied by her conflict with [p]laintiff Roozbeh," and that, as a result, Sieg "failed to formally request a reduction of [p]laintiff Jangjoo's assignments."  *Id.* ¶¶ 52–53.

5

However, when plaintiff Jangjoo sought to return to work after her release, she was "told to come and gather her belongings." Am. Compl. ¶ 74. She was "made to believe that her employment contract with BBG had been terminated," although she never received a letter formally terminating the arrangement. *Id.* ¶¶ 74–76. Jangjoo alleges that she has been effectively barred from performing her employment duties because she was "banned from entering the BBG headquarters." *Id.* ¶ 77. And she claims that as a result of the actions taken against her by defendant Sieg and others at BBG, she has suffered "physical, emotional, mental and financial damage." *Id.* ¶ 81.

## II.    Plaintiff Roozbeh

Plaintiff Roozbeh worked as a Purchase Order Vendor and Social Media Administrator for PNN from November 10, 2014 until August 24, 2015, handling PNN's social media outreach on platforms including Facebook, Google Plus, and Instagram. Am. Compl. ¶¶ 82–83, 86, 88, 96. As Social Media Administrator, he worked under Sieg, who had direct control over anything that Roozbeh posted on PNN's social media channels. *See id.* ¶¶ 86–88.

Roozbeh alleges Sieg pressured him to upload favorable photos and videos of her to Facebook and Instagram, Am. Compl. ¶¶ 86, 88–89, using him "as her instrument to commit waste," which "purposefully interfered with [his] ability to fulfill his professional obligations." *Id.* ¶ 87. Sieg ordered Roozbeh to upload content favorable to her, and to delete content that portrayed her in an unfavorable light, personally or professionally, in order "to promote herself as an individual and to promote her own shows on PNN." *Id.* ¶ 87–88, 94.

In one instance, the State Department's Persian Language Spokesperson asked his followers on Facebook whether they thought PNN was a better news source than BBC Farsi. *Id.* ¶ 89. After followers responded strongly in favor of BBC Farsi, defendant Sieg ordered one of her

subordinates, Mohammad Manzarpour, to tell plaintiff Roozbeh "to find individuals, at whatever cost, to leave positive comments regarding PNN and [defendant Sieg]" on the post.  *Id.*  Roozbeh "found the demand appalling and refused to comply."  *Id.*

In addition, Sieg "frowned upon" Roozbeh's continued friendship with Dehghanpour.  Am. Compl. ¶ 90.  According to the complaint, she tried to pressure Roozbeh by complaining to his contracting supervisor about the pace of his social media updates.  *Id.* ¶ 91.  Roozbeh later explained to his supervisor that "he was in fact not delaying any posts or online submissions, but rather . . . he was strategically working to ensure that PNN received the largest web following possible."  *Id.*  Sieg's complaint was noted in plaintiff Roozbeh's employment file anyway.  *Id.* ¶ 92.

Roozbeh also alleges that Sieg ordered him and others to "delete every comment, from PNN's social media outlets, that related to Mr. Dehghanpour.  *Id.* ¶ 94.  Roozbeh refused this request, arguing that it violated BBG policy.  *Id.*  Sieg then "began to create unnecessary administrative red tape" for Roozbeh, including delaying his request for a replacement press badge and sending him email assignments that "served absolutely no functional purpose" other than to "harass and micro-manage" him.  *Id.* ¶¶ 95–96.

In light of these incidents, on Friday August 21, 2015, plaintiff Roozbeh "decided to voice his grievances to [Voice of America] and BBG senior management by writing an email in [the] form of a resignation letter," which "inform[ed] them of [d]efendant Sieg's behavior and [Roozbeh's] reasons for resigning."  Am. Compl. ¶ 97.  After no one from BBG responded to the email over the weekend, Roozbeh came to work on Monday, August 24, 2015 and learned that Sieg was taking steps to terminate him in the wake of his resignation.  *Id.* ¶¶ 99–100.  So Roozbeh sent another resignation email, this time to all PNN staffers, in which "he shared his decision to

resign, and also his grievances with the mismanagement at PNN and particularly with [d]efendant Sieg's abusive behavior and interference with his contractual obligations." *Id.* ¶ 100

Roozbeh's supervisors challenged the second resignation. Am. Compl. ¶ 101. They "interrogated" him in a meeting by "yelling" at him, and asking him "how dare he quit his contract." *Id.* ¶¶ 101–102. Eventually, an unnamed individual told Roozbeh that he would "help him out" and proposed that Roozbeh waive his legal right to file a complaint against BBG in exchange for BBG's closing out the employment contract administratively. *Id.* ¶ 103. Roozbeh rejected those terms. *Id.* ¶¶ 103–104. While Roozbeh was meeting with PNN management, Sieg was "smearing his reputation and misinforming her staff about the truth of the matter," by claiming that he had been terminated, not that he had resigned. *Id.* ¶ 105.

The next day, August 25, 2015, Roozbeh again went to the contracting office to meet with his supervisors. Am. Compl. ¶ 106. He told them that "if the Agency did not agree with his resignation letter, then he would go back to his desk and would continue working until the end of his contract." *Id.* In response, his supervisors again attempted to induce him to sign a letter terminating his employment and waiving his right to file a complaint against BBG. *Id.* After he again refused, a supervisor told him "you *will* sign and then you will get out of here." *Id.* ¶ 107. Roozbeh again refused, indicating that he wanted to maintain the ability to sue. *Id.* Roozbeh was then told that he was free to leave without signing the waiver. *Id.*

After this meeting, plaintiff Roozbeh received a revised version of his contract with an amended end date of August 23, 2015 – two days after his initial resignation – in place of the original end date of November 9, 2015. Am. Compl. ¶¶ 108, 110. He alleges that this alteration was effectively a termination of his employment, and that he was "not permitted to resign." *Id.* ¶¶ 113–114. He also alleges that "[t]ermination carries vastly different professional consequences

from resignation," and claims that defendants' actions caused him "emotional and financial damage." *Id.* ¶¶ 114–115.

On May 9, 2016, plaintiffs filed an eight-count complaint against BBG and Sieg.  Compl. [Dkt. # 1], which they amended on August 12, 2016.  Am. Compl.  Plaintiff Jangjoo alleges that that defendants Sieg (Count I) and BBG (Count II) violated her First Amendment rights by "involuntarily committing her to a mental health institute," "barring her from entering the BBG headquarters to perform her job duties," and by reducing the number of her assignments in retaliation for exercising her First Amendment rights.  Am. Compl. ¶¶ 117–26.  Plaintiff Jangjoo also contends that defendants Sieg (Count III) and BBG (Count IV), violated her Fifth Amendment rights by denying her due process when they prohibited her entry into the BBG Headquarters, and when they terminated her employment contract.  *Id*. ¶¶ 128–40.  Plaintiff Roozbeh alleges that defendants Sieg (Count V) and BBG (Count VI) violated his First Amendment rights by "harassing and coercing him to waive his legal rights to file a complaint," by retaliating against him for "whistleblowing" by "intentionally spreading lies and misinforming PNN's staff about the status of his employment." *Id*. ¶¶ 152–62.  Plaintiff Roozbeh also contends that defendants Sieg (Count VII) and BBG (Count VIII), violated his Fifth Amendment rights by denying him due process when they terminated his contract.  *Id*. ¶¶ 165–75.

On August 29, 2016, defendants moved for partial dismissal of the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Defs.' Mot.  Plaintiffs opposed the motion on October 4, 2016, Pls.' Resp. & Mem. in Opp. to Defs.' Mot. [Dkt. # 18] ("Pls.' Opp."), and defendants replied in support of their motion on October 28, 2016.  Defs.' Reply in Supp. of Defs.' Mot. [Dkt. # 19] ("Defs.' Reply").  On March 9, 2017, the Court ordered plaintiff Roozbeh to show cause why Count VII should not be dismissed under Rule 12(h)(3) for lack of

subject matter jurisdiction because plaintiff lacks standing, Order to Show Cause [Dkt. # 20], and plaintiff responded to that order.  Pl.'s Resp. to Order to Show Cause [Dkt. # 21] ("Pl.'s OSC Resp.").

<b>STANDARD OF REVIEW</b>

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citations omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiffs' legal conclusions.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

## I.     Subject Matter Jurisdiction

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).  Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").  "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'"  *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).   Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## II.    Failure to State a Claim

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*:   "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss."   *Id.* at 678–79.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.* at 678, citing *Twombly*, 550 U.S. at 556.   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."   *Id.*, quoting *Twombly*, 550 U.S. at 556.   A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555,

and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*, citing *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss under Rule 12(b)(6), the Court is bound to construe a complaint liberally in the plaintiff's favor, and it should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiffs' legal conclusions. *See id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

## ANALYSIS

### I. BBG enjoys sovereign immunity, and so the counts against it will be dismissed.

The United States is immune to suit unless Congress has expressly waived the defense of sovereign immunity in a statute. *United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."). This immunity extends to federal agencies as well. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."), citing *Loeffler v. Frank*, 486 U.S. 549, 554 (1988); *Fed. Hous. Admin. v. Burr*, 309 U.S. 242, 244 (1940).

It is uncontroverted that BBG is an independent federal agency. *See* Am. Compl. ¶ 1; *see also* 22 U.S.C. § 6203; 5 U.S.C. § 104 (establishing BBG as an "independent establishment"

within the executive branch); *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 447 (D.C. Cir. 2009). So plaintiffs bear the burden of establishing that the government has waived its sovereign immunity. *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003).

Plaintiffs have not met their burden in this case. First, plaintiffs concede that they are barred by sovereign immunity from seeking damages from BBG. Pls.' Opp. at 2 ("Defendants are correct that [p]laintiffs are barred from seeking monetary damages for constitutional violations committed by a federal agency"); *see Meyer*, 510 U.S. at 486.

Second, BBG has not waived its sovereign immunity with respect to plaintiffs' request for equitable relief: a declaratory judgment "declaring the acts and practices of [d]efendants to be in violation of the U.S. Constitution," and an injunction directing BBG to reinstate or rehire the plaintiffs and to cease subjecting them to retaliatory and malicious conduct after their return. Am. Compl. ¶¶ 141–42, 146, 176–77, 181. Plaintiffs do not point to any statute as the source of the necessary waiver; while they contend that they have standing to bring their constitutional claims, Pls.' Opp. at 3–4, Article III standing for jurisdictional purposes is an entirely separate issue from the immunity question. Even if a plaintiff has standing to pursue a claim, a court must nonetheless dismiss the case for lack of jurisdiction when the defendant is entitled to sovereign immunity. *See, e.g.*, *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) (analyzing the question of sovereign immunity, then considering the "alternative argument" regarding standing).

Because plaintiffs have failed to carry their burden under Rule 12(b)(1) to demonstrate that the Court has jurisdiction over any of their claims against BBG, the Court will dismiss Counts II, IV, VI, and VIII.

13

**II.    Plaintiff Roozbeh's First Amendment claims against defendant Sieg in Count V fail to state a plausible claim for relief.**

In Count V, plaintiff Roozbeh alleges that Sieg violated his constitutional right to freedom of speech when she "retaliated" against him by taking steps to terminate his employment contract after receiving the two emails in which he resigned.  Am. Compl. ¶¶ 152–57.  In his resignation emails, plaintiff Roozbeh aired grievances against Sieg and other BBG supervisors, claiming that they were engaging in mismanagement and other abuses of their authority.  Am. Compl. ¶¶ 97, 100.  Roozbeh's allegations fail to state a claim because when he took to his computer to complain about Sieg's management and to resign, he was speaking in his official capacity, not in his personal capacity.

As the Supreme Court has explained, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  Therefore, when a public employee's speech was made within "the course of his ordinary job responsibilities . . . 'the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.'"  *Lane v. Franks*, 134 S. Ct. 2369, 2378 (2014), quoting *Garcetii*, 547 U.S. at 418.[4]  And "a public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities, even if the report is made outside his chain of command," *Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009), as long as those job responsibilities fall within the "ordinary" scope of his employment.  *Mpoy v. Rhee*, 758 F.3d 285, 294–95 (D.C. Cir. 2014), citing *Lane*, 134 S. Ct. at

---

4    Independent contractors working for the government enjoy similar First Amendment protections.  *See Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 686 (1996).  Plaintiffs have alleged that they are *de facto* employees of BBG, a claim the Court accepts as true for the purposes of resolving defendants' motion to dismiss.  But even if plaintiffs were contractors, the analysis would remain the same.

2378–80.  In determining the ordinary scope of one's job responsibilities, a court must look beyond formal job descriptions to the substance of the employee's actual duties.  *See id.* at 290, quoting *Garcetti*, 547 U.S. at 424–25.

In *Mpoy*, the D.C. Circuit applied *Lane* in holding that a teacher with the D.C. Public Schools had spoken as a public employee, rather than a private citizen, when he "report[ed] the misconduct and inappropriate conditions he encountered" at a public elementary school in an email sent to the Chancellor of the D.C. Public School System.  *Mpoy*, 758 F.3d at 291.  The Court of Appeals held that the email was "unprotected by the First Amendment because it 'report[ed] conduct that interfere[d] with his job responsibilities'" as a teacher, responsibilities that included reporting misconduct and inappropriate conditions in D.C. schools.  *Id.*, quoting *Winder*, 566 F.3d at 215.  The Court explained that "[b]oth the content and the context of the email, as construed in light of the complaint, indicate that [the plaintiff] was speaking as an employee reporting conduct that interfered with his job responsibilities, rather than as a citizen."  *Id.*

Roozbeh claims that his employment contract was terminated in retaliation for sending two resignation emails that "voice[d] his grievances" about Sieg to his supervisors at BBG, and addressed what he claimed to be Sieg's "abuse of authority, engagement in prohibited personnel practices and mismanagement" of BBG's social media accounts.  Am. Compl. ¶¶ 97, 100.  His first email was sent not only to Sieg, but also to his own POV supervisor, Sieg's supervisor, and BBG's interim CEO and Director; and the second was "a department wide email" sent to all PNN staffers.  *Id*.  Because Roozbeh's claims were made within the ordinary scope of his duties as a BBG employee, his First Amendment challenge fails.

As the cases set forth above establish, the fact that Roozbeh may have gone "outside the chain of command" by conveying his allegations of mismanagement directly to BBG's interim

CEO and Director, and to the full PNN staff, does not transform the incident into speech as a private citizen rather than a public employee. *Mpoy*, 758 F.3d at 293–94, quoting *Winder*, 566 F.3d at 215.

Further, all of Roozbeh's allegations were communicated to fellow BBG personnel only – that is, they were aired internally. Though a public employee is not required to speak outside of the workplace in order for the First Amendment to protect her speech, *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 414 (1979), the fact that Roozbeh's grievances were aired in a purely internal fashion supports the notion that the speech was not made in his capacity as a private citizen. *See Mpoy*, 758 F.3d at 292, quoting *Decotiis v. Whittemore*, 635 F.3d 22, 32 (1st Cir. 2011).

The nature of Roozbeh's allegations also shows that the statements were made in his capacity as a public employee, discussing a matter within the scope of his ordinary duties. Roozbeh sent his emails "as an internal channel," *Mpoy*, 758 F.3d at 294, through which he could report Sieg's alleged "mismanagement . . . abusive behavior and interference with his contractual obligations." Am. Compl. ¶ 100. So, plaintiff alleges that he notified BBG management of Sieg's actions in order to prevent further interference with his obligations as an employee, rather than to raise the issue as a private citizen or to stimulate public discourse about mismanagement at BBG.

Ultimately, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 134 S. Ct. at 2379; *see also Garcetti*, 547 U.S. at 421. Here, plaintiff alleges that it was part of his ordinary duties to push back on attempts to mismanage the organization; the amended complaint reports that Roozbeh had aired similar grievances against Sieg on prior occasions in his capacity as a BBG employee. For example, Roozbeh alleges that Sieg ordered him to "delete

every comment, from PNN's social media outlets, that related to Mr. Dehghanpour," Am. Compl. ¶ 94, but Roozbeh refused to comply, informing his supervisors that he "he would only delete comments that used obscene language," and that he would not "delete comments that were merely critical of Defendant Sieg or those that related to Mr. Dehghanpour" because he believed that might violate Voice of America's charter. *Id.*

Finally, it is of no moment that Roozbeh characterizes his suit as a retaliation claim. *See* Pls.' Opp. at 5. In order for a public employee's First Amendment retaliation claim to proceed, the employee must demonstrate at the outset that the statements that allegedly prompted the retaliation were made in the employee's capacity as a private citizen, and that the speech touched on a matter of "public concern." *Garcetti*, 547 U.S. at 418; *Mpoy*, 758 F.3d at 290; *see also Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008) (noting that *Garcetti* added a "threshold layer," emphasizing first and foremost the "role the speaker occupied" before focusing on the content of the speech). This "threshold layer" ensures that "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Garcetti*, 547 U.S. at 420, quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983).

So even if the Court accepts Roozbeh's assertion that his emails addressed a public interest, he has failed to establish that his allegations were made in his capacity as a private citizen. Thus,

Roozbeh's emphasis on the public interest in his allegations cannot save his retaliation claim, and the resignation emails did not have constitutional protection.[5]

---

5    As the D.C. Circuit emphasized in *Mpoy*, "even if speech is protected by the First Amendment, a court must dismiss claims against a government official in his personal capacity if the official is entitled to qualified immunity." *Mpoy*, 758 F.3d at 295, citing *Lane*, 134 S. Ct. at 2381–82. "Under [the doctrine of qualified immunity], courts may not award damages against a government official in his personal capacity unless 'the official violated a statutory or constitutional right' and 'the right was clearly established at the time of the challenged conduct.'" *Lane*, 134 S. Ct. at 2381–82, quoting *Ashcroft v. al-KidDefs.d*, 563 U.S. 731, 735 (2011). As the Supreme Court explained in *Lane*, "[t]he relevant question for qualified immunity purposes" is whether the official could "reasonable have believed, at the time he fired [the plaintiff], that a government employer could fire an employee on account of" the speech in question. *Id.*

As the Court has found, Roozbeh's speech was "unprotected employee speech," under the law in this Circuit as set forth in *Winder* and *Mpoy*. So defendant Sieg could reasonably have believed that she could fire Roozbeh on account of his resignation emails. *See Mpoy*, 758 F.3d at 295. And even if the Court was "wrong in concluding as a matter of law that the email 'report[ed] conduct that interfere[d] with his job responsibilities,' it surely would not have been unreasonable for the defendants to believe that it did, and hence that it was lawful to fire [the plaintiff] under *Winder*." *Id.*, quoting *Winder*, 566 F.3d at 215. So Sieg would enjoy qualified immunity to the extent that plaintiff Roozbeh seeks damages against her.

For all of these reasons, plaintiff Roozbeh's First Amendment claim against Sieg in Count V will be dismissed for failure to state a claim.[6]

### III.   Plaintiff Roozbeh likely lacks standing to bring his procedural due process claim against defendant Sieg, and his claim fails on the merits in any event.

In Count VII, Roozbeh alleges that Sieg violated his Fifth Amendment right to procedural due process by terminating his employment contract. Am. Compl. ¶¶ 165–69. Though defendants have moved to dismiss Roozbeh's Fifth Amendment claim under Rule 12(b)(6), Defs.' Mot. at 10–12, and plaintiffs responded on that basis, Pls.' Opp. at 11–12, the Court has a constitutional duty to determine at the outset whether Roozbeh has standing to pursue this claim, regardless of whether the issue was raised by the parties. *See* Fed. R. Civ. P. 12(h)(3). And here, since it was plaintiff who brought about the end of his employment relationship with BBG by sending two resignation emails, it is not clear that he can establish the necessary causal connection between the

---

6     Plaintiff Roozbeh also alleges in Count V that "[d]efendant Sieg's actions set forth above" violated Roozbeh's First Amendment rights. Am. Compl. ¶ 152. In the government's motion to dismiss, it argues that, to the extent Roozbeh is alleging that Sieg's insistence on using PNN's social media accounts for her own self-promotion violated Roozbeh's right to free speech, that claim fails, because any statements made on PNN's social media accounts are government speech, which is not protected by the First Amendment. *See* Defs.' Mot. at 8; *see also* Am. Compl. ¶¶ 83–89, 94, 96. Plaintiffs do not respond to this argument, so they may have conceded it. *See* LCvR 7(b). Even if plaintiffs had not conceded the argument, that aspect of Roozbeh's case would fail to state a claim. "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City, UT v. Summum*, 555 U.S. 460, 467 (2009). Therefore, "[w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2245 (2015), citing *Summum*, 555 U.S. at 467–468. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. Roozbeh's job as Social Media Administrator was "to promote PNN and improve its social media presence" by "strategically working to ensure that PNN received the largest web following possible," and posting content approved by his supervisors. Am. Compl. ¶¶ 85, 87, 91. When he posted to BBG's social media accounts under Sieg's direction, he did so as a public employee in the scope of his employment, not as a private citizen. As a result, Roozbeh's allegations would fail to state a cognizable First Amendment claim.

defendant's conduct and the complained-of injury:  his termination.   Therefore, the Court has serious concerns about whether he has standing to sue.  But even if plaintiff has standing, his procedural due process claim fails on the merits because he has failed to allege sufficient facts to support it.

A.    **Plaintiff Roozbeh likely lacks standing to bring a procedural due process claim, since the complaint alleges that he resigned.**

Article III of the Constitution restricts the power of the federal courts to hear only "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  A federal court is "forbidden . . . from acting beyond [its] authority," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), and it has "an affirmative obligation"  to ensure that it has standing before reaching the merits of a dispute. *James Madison, Ltd. v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996), quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 196 (D.C. Cir. 1992).

"The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (alterations in original), quoting *Lujan*, 504 U.S. at 560; *see also Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013) ("'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'"), quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997).  This "doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

"[T]he irreducible constitutional minimum of standing contains three elements."  *Lujan*, 504 U.S. at 560.  First, the plaintiff must have suffered an "injury in fact," or, in other words, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent." *Id.*  "Second, there must be a causal connection between the injury and the conduct

complained of," that is, the injury alleged must be "traceable to the challenged action of the defendant." *Id.*, quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976). Third, it must be likely that "the injury will be redressed by a favorable decision." *Id.* at 561, quoting *Simon*, 426 U.S. at 38.

To establish causation, the plaintiff must allege facts sufficient to show that the alleged injury was caused, directly or indirectly, by the defendant's conduct. *See, e.g.*, *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C. Cir. 1988) ("[M]ere indirectness of causation is no barrier to standing."). The causation requirement ensures that the plaintiff cannot sue because of "the independent action of some third party not before the court," *Lujan*, 504 U.S. at 560–61, or because of an injury he brought upon himself. *Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169, 189 (D.C. Cir. 2012) ("It is of course true that causation can be defeated by voluntary action – purely self-inflicted injury is not fairly traceable to the actions of another.").

A voluntary resignation can render a plaintiff unable to establish the causation element of standing in a case alleging a constitutionally impermissible discharge. *Taylor v. FDIC*, 132 F.3d 753, 767 (D.C. Cir. 1997). In *Taylor*, the Court of Appeals held that the plaintiffs lacked standing to pursue a First Amendment claim of retaliatory discharge against their former employer because their voluntary resignation eliminated the necessary causal nexus between the defendant's conduct and the injury or harm the plaintiffs suffered. *Id.* The Court explained:

> The plaintiffs' voluntary departure creates a large hole in their cause of action: In requesting reinstatement, they seek a remedy for injury that is in large part self-inflicted. This is true whether we treat the defect as a matter of standing or the merits. Article III standing requires the plaintiff to show causation – that his injury is "fairly traceable to the defendant's allegedly unlawful conduct." Our rejection of [the plaintiffs'] claim of constructive discharge is concomitantly a decision that their voluntary acts are sufficient independent causes of their separation from [their employment].

*Id.*, quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984).

Here, plaintiff specifically alleges that he resigned.  Am. Compl. ¶¶ 97, 100.  The fact that defendants revised his contract to advance its termination date, *id.* ¶ 108, after he announced his resignation does not change the result for the purposes of Article III standing.  It was the plaintiff who initiated his separation from BBG, and his actions were a substantial contributing cause, if not *the* cause of agency's decision to terminate his contract.  Thus, the Court can dismiss this claim on the grounds that Roozbeh failed to allege that his dismissal was fairly traceable to Sieg's alleged conduct.

**B.    Even if plaintiff has standing, his procedural due process claim fails on the merits.**

As the *Taylor* opinion points out, plaintiffs allegations that he resigned also defeat his ability to state a claim that survives defendants' Rule 12(b)(6) motion.  *See Taylor*, 132 F.3d at 767.  Roozbeh alleges that defendant Sieg violated his Fifth Amendment rights when she terminated his employment contract.  *See* Am. Compl. ¶ 167.  To state a claim for the denial of procedural due process, a plaintiff must allege that (1) the government "deprived [him] of a 'liberty or property interest' to which [he] had a 'legitimate claim of entitlement,' and that 'the procedures attendant upon that deprivation were constitutionally insufficient.'"  *Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014), quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

The Supreme Court has held that certain public employees have a property interest in their continued employment.  *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576–77 (1972).  When that property interest is alleged to be violated – with allegations that the agency coerced the employee to resign – the Court of Appeals has held that a plaintiff must allege that "[1] an agency imposes the terms of an employee's resignation, [2] the employee's circumstances permit no alternative but to accept, and [3] those circumstances were the result of improper acts of the agency."  *Keyes v. District of Columbia*, 372 F.3d 434, 439 (D.C. Cir. 2004).

Here, plaintiff initiated his separation from the agency by sending not one, but two emails announcing his resignation.   Am. Compl. ¶¶ 97, 100.   Plaintiff does allege that the agency thereafter took steps to induce Roozbeh to accept a termination in exchange for a mutual release of claims, *id.* ¶¶ 101–07, and he also alleges that ultimately, he was presented with a revised version of his contract with an advanced termination date.  *Id.* ¶ 108.  But plaintiff is so adamant that he in fact resigned and was not fired that he specifically alleges that any statements to the contrary were defamatory.  *Id.* ¶ 105 (alleging that Sieg defamed Roozbeh when she told others that he was terminated).  So for the same reasons that plaintiff can likely not show that he has standing, he has not stated claim for a violation of his due process rights.

## CONCLUSION

For the foregoing reasons, the Court will grant defendants' motion to dismiss Counts II, IV, V, VI, VII, and VIII – all counts against defendant BBG, and both of plaintiff Roozbeh's claims against defendant Sieg.  However, defendants did not move to dismiss Counts I and III – plaintiff Jangjoo's First and Fifth Amendment claims against defendant Sieg, in her individual capacity; those claims will proceed.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 27, 2017

23