UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SOHEILA JANGJOO**, | |
| Plaintiff, | |
| v. | Case No. 1:16-cv-00870 (TNM) |
| **SETAREH DERAKHSHESH SIEG**, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Soheila Jangjoo, a former vendor for the Broadcasting Board of Governors ("BBG"), seeks injunctive and monetary relief from Setareh Sieg, Director of the BBG component Persian News Network ("PNN"). Am. Compl. ¶¶ 13, 16, 141-50. Ms. Jangjoo alleges that Ms. Sieg abridged her First Amendment right to free speech by retaliatorily reducing Ms. Jangjoo's work assignments after Ms. Jangjoo signed a petition protesting the removal of the host of a popular television program on PNN. *Id.* ¶¶ 19-23, 39-40, 117-18. Ms. Jangjoo also alleges that Ms. Sieg barred her from entering the BBG building in violation of the Fifth Amendment's due process clause. *Id.* ¶ 130. Ms. Sieg, who is being sued in her individual capacity, seeks summary judgment for the First Amendment claim on the bases that relief is unavailable to Ms. Jangjoo under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and that even if it were, Ms. Jangjoo's speech is not protected by the First Amendment, is foreclosed by qualified immunity, and is unrelated to the reduction of her assignments. Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. ("Mot. for Summ. J.") 1-2, ECF No. 35-1. As to Ms. Jangjoo's Fifth Amendment claim, Ms. Sieg argues that, in addition to her legal arguments, she was not involved in barring Ms. Jangjoo from the premises.

*Id.* 40-42. I find that *Bivens* provides no remedy for Ms. Sieg's alleged constitutional violations and that no genuine issue of material fact exists about whether the reduction in work assignments related to the petition and whether Ms. Sieg improperly barred Ms Jangjoo from the BBG premises. Ms. Sieg's motion will be granted.

## I. BACKGROUND

### A. The BBG and Ms. Jangjoo's Professional Performance

The BBG is a federal agency that oversees the U.S. Government's non-military international broadcasting with a mission to engage a global audience to support freedom and democracy. Am. Compl. ¶¶ 15, 17.[1] One of its networks, Voice of America ("VOA"), produces news, information, and cultural programs in more than 45 languages, including Persian. *Id.* ¶ 17. The Voice of America Persian Service ("PNN"), focuses on the people of Iran and on Persian speakers. *Id.* One of PNN's television shows, which Ms. Jangjoo describes as one of PNN's most popular programs, is a talk show called *Ofogh*, whose host and managing editor was Siamak Dehghanpour. *Id.* ¶¶ 19-20.

Ms. Jangjoo was a contracted Chyron/Teleprompter Operator for PNN between April 2012 and November 2015 and provided services for shows such as *Rooye Khat* and *Khiabane Zendegi*. *Id.* ¶¶ 30-31, 35; Def.'s Statement of Material Facts ("SOMF") ¶ 1, ECF No. 35-2. The parties disagree over whether she was a contractor or an employee, but all agree that she had a contract with BBG, was retained on an "as needed" basis, and was not guaranteed any minimum number of hours or assignments in any particular period. *Id.* ¶ 2; Pl.'s Resp. to Def.'s SOMF ¶ 2, ECF No. 36-2 (disputing only the description of Ms. Jangjoo as a contractor).

---

[1] Unless noted otherwise, all citations in Section I. are to undisputed facts.

Ms. Jangjoo alleges that for most of her tenure at PNN, she received 18 assignments a month, each lasting about an eight-hour workday.  Am. Compl. ¶ 34.

The parties disagree over how well Ms. Jangjoo performed in both of her roles at PNN. Nicholas Kalhor, an Executive Producer and Ms. Jangjoo's first-line supervisor, testified that he found her "unwilling to perform the essential duties of her job," could not "operate the chyron and teleprompter properly," was "frequently insubordinate and unprofessional," and that her "attendance was unreliable" and she "consistently displayed a poor work ethic and an inability to take direction and constructive feedback."  Mot. for Summ. J. Ex. 23 ("Decl. of Nicholas Kalhor") ¶¶ 6-7, ECF No. 35-5.  After speaking to Ms. Jangjoo several times about her performance and seeing no improvement, Mr. Kahlor recommended in late February 2015 to the Agency Contract Officer, Cheryl Nixon that Ms. Jangjoo be placed on a two-week probationary period.  *Id.* ¶ 7.  Ms. Jangjoo's former first-line supervisor, Kaveh Adib, also agreed with the recommendation "as he experienced the same issues when she was under his supervision."  *Id.* at 4.

Following these recommendations, the Office of Contracts reportedly spoke with Ms. Jangjoo, who agreed to improve her performance.  *Id.* ¶ 8.  Ms. Jangjoo disputes these characterizations because "there was a group of employees who wanted to get rid of [Ms.] Jangjoo at that time," and clarifies that Ms. Sieg denied the recommendation for probation and extended her contract for another year.  Pl.'s Resp. to Def.'s SOMF ¶¶ 10-11.

In March 2015, Ms. Jangjoo's contract was modified to add services as a Writer/Researcher/Reporter/Producer.  Am. Compl. ¶ 32.  PNN supervisors were unimpressed with her work; Mr. Kalhor stated that Ms. Jangjoo had "poor TV production skills" and an Executive Editor described one report produced by Ms. Jangjoo as "follow[ing] no logic and was

put together with total anarchy."  Def.'s SOMF ¶¶ 13-14.  Ms. Jangjoo does not dispute that she

was responsible for putting together the report, but claims that others, who she does not name,

were also involved.  Pl.'s Resp. to Def.'s SOMF ¶ 13.

### B. Events Leading to the Online Petition About Mr. Dehghanpour's Removal from Hosting *Ofogh*

In April 2015, an incident occurred between PNN and the host of *Ofogh*.  Def.'s SOMF

¶¶ 19-21; Opp. to Mot. for Summ. J. ("Pl.'s Opp.") Ex. 8 ("Statement of Siamak Dehghanpour")

at 10, ECF No. 36-10.  PNN claims that Mr. Dehghanpour refused at the last minute, despite

orders from the Executive Editor and Ms. Sieg, to go on air to report on the breaking news of the

Iranian nuclear deal.  Def.'s SOMF ¶ 19.  PNN's impression was that the refusal related to not

wanting to work with a would-be co-anchor.  *Id*. ¶ 20.  Mr. Dehghanpour's version of events was

that he wanted to proceed with his show as scripted (also about the Iran nuclear deal), and did

not feel comfortable interrupting the scheduled line-up of speakers to deliver breaking news that

had not yet been confirmed by the Associated Press or the White House.  *See* Statement of

Siamak Dehghanpour at 1, 5.  With respect to the co-host, he stated that he had "never co-hosted

a show in the middle of a program on air" and that "there was no clear order nor a clear mission"

for him to follow.  *Id*. at 8.  Following this incident, Mr. Dehghanpour was removed from the air.

Def.'s SOMF ¶ 22.

In summer 2015, a petition was posted on the website change.org to reinstate

Mr. Dehghanpour.  Def.'s SOMF ¶ 24.  Ms. Jangjoo signed the petition in July 2015.  *Id*. ¶ 25.

On July 18, 2015, Ms. Sieg received an email with a link to the petition, but claims that she did

not click on the link.  *Id*. ¶¶ 26, 28.  A search of Ms. Sieg's browsing history on her work a

showed that she did not visit any change.org site in July or August 2015.  *Id*. ¶ 28.  The facts that

Ms. Jangjoo signed the petition and that Ms. Sieg received an email with a link to the petition, but did not check any change.org website from her work computer in July or August 2015, are all undisputed.  Pl.'s Resp. to Def.'s SOMF ¶¶ 25-29.  It is also undisputed that Ms. Sieg receives around 300 emails a day and does not open all of them, and Ms. Jangjoo does not claim to have shown the petition to Ms. Sieg.  *Id.* ¶¶ 27, 29.

### C.  VOA's Ongoing Budgetary Difficulties and Ms. Jangjoo's Reduction of Work

Concurrent to these events were VOA's budgetary difficulties.  Ms. Sieg claims that in early 2015, she was instructed to begin identifying contracts to reduce or eliminate; by mid-May 2015, she was told that VOA would "likely have to make some reductions in contractors due to budget cuts."  Def.'s SOMF ¶¶ 31, 33-34.  On July 22, 2015, it was again reiterated to Ms. Sieg by email that the "VOA budget is tight this year" and to "ensure that you are only funding or purchasing items that are 'must haves' and not wish list items."  *Id.* ¶ 35.  A memorandum circulated to prepare for an anticipated $1.5 million budgetary shortfall explained that PNN would have to reduce contractor costs by 30%, either by "reducing the average number of days per month that each contractor can work from 18 to 11" or by "eliminating approximately 25 contract positions (out of 81)."  *Id.* ¶ 36.

In September 2015, an analysis determined that reducing Ms. Jangjoo's assignments from 18 to 10 per month would enable the budget for her position to last until early February 2016, a few weeks before her contract was scheduled to end.  Mot. for Summ. J. Ex. 15, ECF No. 35-4.  PNN management also determined that Ms. Jangjoo's services could be cut to four hours a day since she only worked on a particular show.  Def.'s SOMF ¶ 42.  Mr. Kalhor made both recommendations to Ms. Nixon based on Ms. Jangjoo's performance and PNN's "reduced need for her services."  *Id.* ¶ 43.

On November 10, 2015, Mr. Kalhor emailed Ms. Jangjoo that she would have 10
assignments totaling 80 hours that month.  Mot. for Summ. J. Ex. 16.  Two days later,
Messrs. Kalhor and Adib told her in person that her assignments would only be for four hours a
day.  *Id.* Ex. 17.  Mr. Adib reported to Ms. Sieg that Ms. Jangjoo's response was to "[take] the
conversations to a personal level" and that she threatened to "set herself on fire" in front of the
building.  *Id.*  Mr. Adib also wrote that Ms. Jangjoo thought "this decision [was] on a personal
level and some people including [Mr. Adib] have been planning to terminate her contract for a
long time."  *Id.*  Ms. Sieg forwarded Mr. Adib's email to Human Resources, the Office of
Security, and the Office of Contracts.  *Id.*

### D.  Ms. Jangjoo's Removal and Bar from the Building

On November 13, 2015, the Office of Security and the Insider Threat Manager
interviewed Ms. Jangjoo and reported that she was "still upset" about her hours being reduced
but that she claimed not to be serious about the earlier threat of self-immolation.  *Id.* Ex. 18.  The
Insider Threat Manager also reported that Ms. Jangjoo was transported to D.C. Psychiatric
Services by the police for further evaluation.  *Id.*  While BBG asserts that they called the police
after Ms. Jangjoo agreed to receive medical attention, Ms. Jangjoo claims that she only asked for
assistance and not a medical evaluation.  Def.'s SOMF ¶ 63; Pl.'s Response to Def.'s SOMF
¶ 63.

After the incident, BBG's security team recommended that Ms. Jangjoo be barred from
returning to the building, and a group representing Human Resources, Contracts, and
Ms. Jangjoo's supervisors accepted this recommendation.  Mot. for Summ. J. Ex. 27, ECF No.
35-5.  The group also agreed that the remainder of the funds on Ms. Jangjoo's contract would be
paid to her and that her contract would be terminated.  *Id.*; *cf.* Pl.'s Opp. Ex. 15, ECF No. 36-12

(email from Contract Specialist stating that no termination letter was executed). It is undisputed that Ms. Sieg did not participate in the meeting between Ms. Jangjoo and BBG's security team and that Ms. Sieg had no role in having Ms. Jangjoo escorted from the building or being barred from it afterwards. Def.'s SOMF ¶¶ 66-67.

### E. Procedural History of this Lawsuit

Ms. Jangjoo began this lawsuit in May 2016 and, with leave of court, filed an amended complaint in late August 2016. Compl., ECF No. 1; Am. Compl., ECF No. 14. The original lawsuit was brought by Ms. Jangjoo and another plaintiff against the BBG and Ms. Sieg. *See id.* The Defendants moved to dismiss all claims except for two brought by Ms. Jangjoo against Ms. Sieg in her personal capacity, which another judge of this District granted. Mem. Op. 2, ECF No. 23. The two remaining claims are Ms. Jangjoo's First Amendment claim that Ms. Sieg infringed on her right to free speech by reducing Ms. Jangjoo's assignments in retaliation for signing the petition, and her Fifth Amendment claim that Ms. Sieg's "prohibition of Plaintiff Jangjoo's entry into the BBG Headquarters violated her due process rights." *See* Am. Compl. ¶¶ 117-18, 130. Ms. Sieg now seeks summary judgment on these claims.

## II. LEGAL STANDARD

To prevail on summary judgment, the movant must show an absence of a genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson*, 477 U.S. at 248. The Court views the evidence in the light most favorable to the non-moving party. *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016).

## III. ANALYSIS OF FIRST AMENDMENT CLAIM

Ms. Jangjoo's First Amendment claim fails as a matter of law because the First Amendment has not been recognized as a basis for a *Bivens* action, nor does controlling precedent dictate that one should now be judicially created to cover Ms. Jangjoo's cause of action. Second, even if a *Bivens* remedy existed, which it does not, Ms. Sieg is entitled to qualified immunity. Last, although these bases independently preclude review of the merits, there is no genuine issue of material fact that signing the petition led to the reduction of Ms. Jangjoo's work assignments or being barred from the BBG premises.

### A. Overview of *Bivens* Remedies

Because Ms. Jangjoo seeks, among other remedies, monetary damages for an alleged constitutional violation, but alleges no statutory provision that provides for this relief, her claim arises under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *See* Am. Compl. ¶¶ 116-120, 127-133 (alleging violation of the First and Fifth Amendments); Pl.'s Opp. 12-18, ECF No. 36-1 (arguing that she has a *Bivens* remedy). In *Bivens*, the Supreme Court held that federal officers who violated the Fourth Amendment's prohibition against unreasonable searches and seizures could be held accountable for monetary damages without explicit statutory authorization for such damages. 403 U.S. at 397. Before *Bivens*, only state officials who violated individuals' constitutional rights could be liable for money damages, *see* 42 U.S.C. § 1983; Congress has not enacted a similar statutory provision for federal officials. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017). Since *Bivens*, the so-called implied cause of action for a constitutional violation has only been recognized by the Supreme Court in two other contexts: the Fifth Amendment's due process clause for an allegation of

gender discrimination, *Davis v. Passman*, 442 U.S. 228 (1979), and the Eighth Amendment's cruel and unusual punishments clause for the alleged failure to provide adequate medical treatment to an inmate, *Carlson v. Green*, 446 U.S. 14 (1980). *Id*. at 1854-55.

Recently, in *Ziglar v. Abbasi*, the Supreme Court refused to judicially create a *Bivens* action for the petitioners' Fourth and Fifth Amendment due process and equal protection claims, instead finding that the remedy was one for Congress to create. *Id*. at 1860. The Court's analysis in *Abbasi* is particularly instructive here, and applying that analysis to the facts here dictates that there is no *Bivens* remedy for Ms. Jangjoo's First Amendment claim.

The petitioners in *Abbasi* were six men unlawfully present in the United States and detained in the aftermath of the September 11th attacks. *Id*. at 1853. All were removed from the country and subsequently sued former Attorney General John Ashcroft, former FBI Director Robert Mueller, and former Immigration and Naturalization Service Commissioner James Ziglar, as well as the detention center's Warden and Associate Warden, seeking damages for the harsh detention conditions that they allegedly faced while detained. *Id*. They sought relief under the Fourth Amendment's prohibition on unreasonable searches and seizures and the Fifth Amendment's due process and equal protection clauses. *Id*. at 1853-54.

In explaining the framework to use in considering the petitioners' claim, the Court focused on the separation of powers between the judicial and legislative branches. For statutes, the "'determinative' question is one of statutory intent" and a court cannot judicially create a cause of action where Congress did not intend to create one. *Id*. at 1855-56. For the Constitution, however, "there is no single, specific congressional action to consider and interpret," *id.* at 1856, and the Court decided that it should exercise its power to grant relief "where federally protected rights have been invaded." *Bivens*, 403 U.S. at 392 (quoting *Bell v.*

*Hood*, 327 U.S. 678, 684 (1946)). Although historically done, the Court in *Abbasi* recognized this exercise of judicial authority as "a significant step under separation-of-powers principles" and noted that it is since "adopted a far more cautious course before finding implied causes of action." 137 S. Ct. at 1855-56. Indeed, the Court acknowledged that "it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today" because "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Id*. at 1856-57. This is because separation of powers principles counsels that Congress will usually be the proper body to decide whether a damages remedy should exist for a constitutional violation. *Id*. at 1857.

Given these precepts, "a *Bivens* remedy will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'" *Id*. (internal quotation marks omitted).

Some of these non-exhaustive "special factors" are whether the Judiciary is well suited to weigh the costs and benefits of allowing a damages remedy to proceed, whether design of a certain regulatory scheme counsels judicial non-interference, or whether Congress has provided an alternative remedial structure. *Id*. at 1858. Before conducting its special factors analysis, however, the Court found that the lower court erred by concluding that the claims made did not present a new *Bivens* context (and so warranted no special factors analysis). *Id*. at 1859. Whether the context is new is "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by this Court." *Id*. Some non-exhaustive examples how a case could be meaningfully different are "the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was

operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider." *Id*. at 1860. The Court found that the petitioners' claims, because they arose in the context of high-level executive policy decisions made in the aftermath of September 11th, presented a different context than the Court's prior *Bivens* cases. *Id*.

Returning to the special factors analysis, the Court noted that *Bivens* was not designed to hold officers accountable for their subordinates, and that even if the Court focused on the discrete act of a particular defendant-officer, the conduct complained of amounted to a policy decision that, if allowed to proceed, would potentially deter future officials from effectively discharging their duties. *Id*. The discovery and litigation process involved in such lawsuits would also involve the intimate deliberative process of executive policy formation, an area not suited for judicial branch interference. *Id*. at 1860-61.

The Court also found that the petitioners' claims implicated sensitive issues of national security, which is within the purview of the legislative and executive branches, and that the precise nature of the remedy sought—monetary damages, as opposed to equitable or injunctive relief—may particularly cause "an official to second-guess difficult but necessary decisions concerning national security policy." *Id*. at 1861. It was also "telling" that despite "frequent and intense" Congressional interest in the United States' response to the September 11th attacks, including a specific report by the Department of Justice's Office of the Inspector General on detention conditions at the facility that held the petitioners, Congress did not act to provide for a damages remedy. *Id*. at 1862. This "suggest[s] that Congress' failure to provide a damages remedy might be more than mere oversight, and that congressional silence might be more than 'inadvertent.'" *Id*. The Court also found that the petitioners could have alternatively sought

injunctive relief or a writ of habeas corpus. *Id*. at 1862-63. Because the special factors analysis and the availability of "alternative forms of judicial relief" all suggested that Congress, not the Judiciary, should fashion a damages remedy for the petitioners, the Court held that the petitioners' suit could not arise under *Bivens*. *See id.* at 1860-63.

### B. There Is No *Bivens* Remedy for Ms. Jangjoo's First Amendment Claim

Following the Supreme Court's analysis in *Abbasi* leads to the same conclusion that the monetary damages sought by Ms. Jangjoo is unavailable under a *Bivens* action. To begin with, using *Bivens* as a vehicle for relief for Ms. Jangjoo's First Amendment claim is a new *Bivens* context. The Court has yet to extend *Bivens* beyond three specific instances: *Bivens* itself (Fourth Amendment), *Davis* (Fifth Amendment), and *Carlson* (Eighth Amendment). *Id.* at 1854-55. In the First Amendment context, the Court has addressed but never affirmatively extended *Bivens*. *See Wood v. Moss*, 134 S. Ct. 2056, 2066 (2014) (assuming without deciding that *Bivens* extends to First Amendment claims); *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (assuming without deciding that a First Amendment free exercise claim is actionable under *Bivens*).

Although Ms. Jangjoo points to *Navab-Safavi v. Broadcasting Board of Governors*, 650 F. Supp. 2d 40 (D.D.C. 2009), as an instance in which a lower court has recognized a First Amendment claim under a *Bivens* action, Pl.'s Opp. 12-14, *Abbasi* counsels that courts should be reluctant to create a damages remedy for any other claims. 137 S. Ct. at 1856-57. Ms. Jangjoo has not identified a post-*Abbasi* case in which this has occurred. *See* Pl.'s Opp. 12-14. In any event, the more relevant question to ask is whether the Supreme Court has recognized *Bivens* in the First Amendment context, and the answer to that is no. *Reichle v.* Howards, 566 U.S. 658, 663 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims.").

Extending *Bivens* here to Ms. Jangjoo's First Amendment claim would be meaningfully different from the *Bivens* remedies currently recognized by the Supreme Court.

Moreover, there are several "special factors counselling hesitation in the absence of affirmative action by Congress." *Abbasi*, 137 S. Ct. at 1857. *First*, as in *Abbasi*, although Ms. Jangjoo's complaint is against Ms. Sieg, the conduct of which Ms. Jangjoo complains— having the number of assignments reduced and the number of hours per assignment—were decisions made and communicated to Ms. Jangjoo by individuals other than Ms. Sieg. Def.'s SOMF ¶¶ 42-43; Mot. for Sum. J. Exs. 16, 17. The record reveals that the agency was soon to be under budgetary pressures, Def.'s SOMF ¶ 36, and that an analysis suggested that reducing Ms. Jangjoo's assignments to 10 per month would allow the funds on her contract to last through almost the end of her term. Mot. for Summ. J. Ex. 15. This analysis was conducted by others and Ms. Sieg only learned of it after the fact. *Id.* It was Mr. Kalhor who notified Ms. Jangjoo that she would have 10 assignments for November 2015, and Messrs. Kalhor and Adib who communicated to Ms. Jangjoo that her services would only be needed for four hours a day. Mot. for Summ. J. Exs. 16-17. Ms. Jangjoo points to no evidence in the record showing that Ms. Sieg was the driver of these determinations. *Cf.* Mot. for Summ. J. Ex. 20 ("Decl. of Setareh Sieg") ¶ 17, ECF No. 35-4 ("I agreed to reduce Ms. Jangjoo's assignments in deference to the recommendation of Nicholas Kalhor, who was her [first-line supervisor]"), *id.* ¶ 22 ("I never discuss hours or duties directly with a contractor – that is the role of the [supervisors], who was Nicholas Kalhor in [Ms. Jangjoo's] case").

Ms. Jangjoo's only retort to Ms. Sieg's lack of participation is her bare allegation that she confronted Ms. Sieg one day in the hallway and asked about the reduction of her assignments, to which Ms. Sieg allegedly responded that she no longer trusted Ms. Jangjoo because Ms. Jangjoo

signed the petition. Pl.'s Opp. 5. Ms. Jangjoo provides no citation—to the record or otherwise—to support this single, self-serving statement. *Cf.* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record"). Thus, Ms. Jangjoo's dependency on a *respondeat superior* theory to seek money damages for her reduction of work assignments—decisions that the record does not suggest Ms. Sieg initiated or pushed for—counsels against the creation of a *Bivens* action. *See Iqbal*, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.").

*Second*, even viewing the record in the light most favorable to Ms. Jangjoo, the conduct complained of is, at its core, a staffing dispute. Ms. Jangjoo complains that the number and duration of her work assignments were reduced and seeks reinstatement to her previous schedule. Am. Compl. ¶¶ 118, 141. As described above, however, she points to no evidence to show a genuine dispute of material fact about whether Ms. Sieg ordered these actions to occur. Thus, what is left is a dispute over the agency's decision-making about staffing, a core function within the discretion of the agency. This insight is supported by the terms of Ms. Jangjoo's contract, which all parties agree provided that her services be on an "as needed" basis and without guarantee to any minimum number of hours or assignments. Def.'s SOMF ¶ 2, Pl.'s Resp. to Def.'s SOMF ¶ 2. Creating a new remedy that would necessarily implicate the deliberative process of the agency in its work assignment decisions would impermissibly infringe on the agency's discretion to form and manage contracts and to make everyday staffing decisions. *See* Mot. for Summ. J. 17-18 (arguing that the agency's ability to effectively manage contracts would be disrupted).

Extending *Bivens* to this context would likely also lead to increased litigation and subject the agency to the burdens of discovery and the litigation process. For example, in this case alone, which was first started over two years ago, Compl. (May 9, 2016), ECF No. 1, the agency has filed two motions to dismiss (ECF Nos. 12, 15), addressed several discovery issues such a motion for a protective order from a third-party witness sought to be deposed by Ms. Jangjoo (ECF No. 29), successfully defended against a motion for sanctions (ECF No. 40), and briefed this motion for summary judgment (ECF No. 35). These considerations counsel against judicial intrusion into the staffing decisions of an agency within another co-equal branch of government. *Cf. Abbasi*, 137 S. Ct. at 1860-61 ("Allowing a damages suit in this context, or in a like context in other circumstances, would require courts to interfere in an intrusive way with sensitive functions of the Executive Branch.").

*Third*, an alternative remedial structure exists through the Administrative Procedure Act ("APA").[2] The APA permits individuals to bring a judicial challenge to agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and to be afforded equitable relief. 5 U.S.C. §§ 702, 706(2)(A). Ms. Jangjoo could have challenged the reduction of her work assignments through the APA. She argues that the APA, a procedural mechanism to challenge agency action, cannot remedy the substantive harm—the alleged First Amendment violation—here. Pl.'s Opp. 12-14. That misses the mark for multiple reasons, not

---

[2] Ms. Sieg argues that Ms. Jangjoo also could have pursued relief under the Contract Disputes Act ("CDA"), 41 U.S.C. § 7101 *et seq*., which authorizes contractors to appeal a contracting officer's decision in federal court. Mot. for Summ. J. 15-17. Because the sum total of the parties' arguments on the CDA occupies only two full pages of their briefs, *id.*, Pl.'s Opp. 14, and because I find that several factors counsel against creating a *Bivens* action, including that the APA is a comprehensive alternative remedial scheme, it is unnecessary to address the CDA.

least of which is that she seeks, among other remedies, injunctive relief to be reinstated to the full stature of her previous position, a remedy possible through the APA. *See* Am. Compl. ¶ 141.

Additionally, that the APA would not entitle Ms. Jangjoo to monetary damages does not mean that a *Bivens* action should be judicially created. The Supreme Court and the D.C. Circuit have held that a "remedial statute need not provide full relief to the plaintiff to qualify as a 'special factor.'" *Wilson v. Libby*, 535 F.3d 697, 705 (D.C. Cir. 2008) (citing *Schweiker v. Chilicky*, 487 U.S. 412 (1988)). Instead, it is the "comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies extended thereunder, that counsels judicial abstention." *Spagnola v. Mathis*, 859 F.2d 223, 227 (D.C. Cir. 1988). This is because when Congress has legislated a comprehensive scheme, it is not the judiciary's role to second-guess the scheme or to try to better it. *See Wilson*, 535 F.3d at 706. "Congress is the body charged with making the inevitable compromises required in the design of a massive and complex . . . program." *Chilicky*, 487 U.S. at 429.

Here, it can hardly be said that the APA is not a comprehensive scheme. As any litigator or judge in this District is aware, the APA is often used to challenge a wide range of adverse employment decisions. The existence of this comprehensive statutory scheme, particularly one that would afford Ms. Jangjoo the same injunctive relief that she seeks here, counsels against the creation of a *Bivens* remedy.

Indeed, in *Bush v. Lucas*, a case factually similar to Ms. Jangjoo's, the Supreme Court declined to create a *Bivens* remedy for a First Amendment claim for retaliatory demotion. 462 U.S. 367, 371-72, 390 (1983). In *Bush*, the petitioner, an aerospace engineer, was demoted after appearing on television and making highly critical statements of his employer, NASA. *Id.* at 369-70. The Court characterized the central question as, "[w]hen a federal civil servant is the

victim of a retaliatory demotion or discharge because he has exercised his First Amendment rights, what legal remedies are available to him?" *Id.* at 381. The Court found that the a "elaborate, comprehensive scheme" existed—there, civil service remedies—to challenge improper agency action that "provides meaningful remedies for employees who may have been unfairly disciplined for making critical comments about their agencies." *Id.* at 385-86. Thus, Congress was better suited to determine whether this scheme "should be augmented by the creation of a new judicial remedy for the constitutional violation at issue." *Id.* at 388. The Court came to this conclusion assuming that the civil service remedies were not as effective as individual damages because they did not provide for punitive damages, a jury trial, or deter the unconstitutional conduct of supervisors. *Id.* at 372 n.8.

Confronting the same question here leads to the same conclusion: the APA is a comprehensive scheme able to challenge the agency's decision, even if it does not provide for damages or address the allegedly unconstitutional conduct, and the Court should not interfere with Congress' chosen methods of implementing the scheme.

Ms. Jangjoo argues that her case is like, and should follow, *Navab-Safavi v. Broadcasting Board of Governors.* Pl.'s Opp. 13-14. In *Navab-Safavi*, another judge in this District found that the APA and the CDA were not comprehensive alternative remedial schemes constituting "special factors" counseling against the judicial creation of a *Bivens* remedy. 650 F. Supp. 2d at 66-67, *aff'd on other grounds sub nom. Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011). Although the case is factually similar—there, a contractor for PNN was terminated for appearing in a music video criticizing the United States' involvement in Iraq, *id.* at 313—it occurred pre-*Abbasi*. In conducting its analysis, the *Navab-Safavi* Court noted that the Supreme Court had then-recently assumed without deciding that *Bivens* actions were possible for First

Amendment cases. 650 F. Supp. 2d at 65-66 (citing *Iqbal*, 556 U.S. at 675). But now *Abbasi* makes unequivocally clear that expanding *Bivens* has become a "'disfavored' judicial activity" and that Congress will invariably be the proper branch of government to create a damages remedy for a constitutional violation. 137 S. Ct. at 1856-57. Given this background, and the other special factors present here—a *respondeat superior* theory of liability and interference with agency staffing decisions—it is this Court's determination that a *Bivens* remedy is unavailable for Ms. Jangjoo's First Amendment claim.

### C. Alternatively, There is No Genuine Issue of Material Fact That the Petition Was Causally Linked to the Adverse Actions

Setting aside the lack of a *Bivens* remedy for Ms. Jangjoo's First Amendment claim, her claim alternatively cannot proceed because no genuine issue of material fact exists that the petition and the reduction in work hours are causally linked. To show a violation of a constitutional right, Ms. Jangjoo must show that (1) she engaged in conduct protected by the First Amendment, (2) the agency took a retaliatory action "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again," and (3) there was a causal link between the speech and the adverse action. *See Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Ms. Sieg argues that Ms. Jangjoo's claim fails on the first and third prongs. Mot. for Summ. J. 19-20, 28. Although I assume for the sake of argument that signing the petition could be First Amendment protected activity, there is no genuine issue of material fact on whether a "causal link" exists between the activity and the reduction of Ms. Jangjoo's work assignments.[3] Because of that fatal flaw, Ms. Sieg is entitled to summary judgment.

_____

[3] As Ms. Sieg points out, Ms. Jangjoo did not respond to any of the arguments advanced that there was no "causal link" between the speech and the adverse action. Reply in Supp. of Mot.

To be protected by the First Amendment, a public employee's speech, must, at minimum, be a "matter of public concern," *Bowie v. Maddox*, 642 F.3d 1122, 1133 (D.C. Cir. 2011), which is a question of law. *LeFande v. District of Columbia*, 613 F.3d 1155, 1159 (D.C. Cir. 2010). Evaluating this question requires examination of the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). Speech that is "relating to [a] matter of political, social, or other concern to the community" is protected, while speech about "individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies" is not. *LeFande*, 613 F.3d at 1159, 1161.

Ms. Sieg's position is that the petition is merely a personal dispute between Mr. Dehghanpour, the former host of *Ofogh*, and PNN about how the show should be staffed. Mot. for Summ. J. 21. In support, Ms. Sieg argues that the petition is ultimately about the incident where Mr. Dehghanpour refused to go on air at the last minute despite his superiors' orders, and characterizes it as a "professional disagreement about how a particular episode of a show should be staffed." *Id*. Ms. Sieg acknowledges that personnel matters *can* be matters of public concern, Mot. for Summ. J. 23 (citing *LeFande*, 613 F.3d at 1161), but argues that the petition is not analogous to the other circumstances where a petition has been recognized as a matter of public concern, involving, for example, "the framework by which the [agency] was to be governed." *Id*. at 1162. The crux of Ms. Sieg's objection is that the petition is not of

_____

for Summ. J. 10-11, ECF No. 37 (citing *Magliore v. Brooks*, 844 F. Supp. 2d 38, 43 (explaining that a party concedes an issue by failing to address or rebut the argument)). The failure to respond is more than mere oversight, as Ms. Sieg's argument spanned many pages in her motion. *See* Mot. for Summ. J. 28-39.

sufficient significance that has been recognized in other cases as matters of public concern.  *See*

Mot. for Summ J. 22, 24.

It is far from clear that the petition was merely about an individual personnel dispute that did not have greater societal and public relevance.[4]  PNN's mission is to produce content that engages the people of Iran and Persian speakers, and Ms. Jangjoo claims that *Ofogh* is one of the channel's most popular shows.  *See* Pl.'s Opp. Ex. 18 (letters of support for Mr. Dahghanpour including from a former President of Iran, a former diplomat of Iran, and various journalists and scholars, stating that *Ofogh* was a popular, well-regarded show).  The particular show the day of the incident focused on the Iran nuclear deal, an event of significant public interest and global importance.  Thus, PNN's broadcast—for that particular show, and also more generally—is, by its nature, focused on topics of public evaluation and on conveying information to the public. Who the public entrusts to deliver that information, when the providing entity is a part of the United States Government, is potentially of public concern.  It is not necessarily the case that the "information would be of no relevance to the public's evaluation of the performance of governmental agencies." *LeFande*, 613 F.3d at 1159.

Recognizing this intricacy here does not mean that "all matters which transpire within a government office are of public concern . . . and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *See Connick*, 461 U.S. at 148-49 (holding that an assistant district attorney's questionnaire distributed to her co-workers about the office's transfer policy and office morale was not a matter of public concern, except for one

---

[4]  True, the Court previously characterized Ms. Jangjoo's complaint as "at its core, a staffing dispute."  See *supra* Section III.B.  But the staffing dispute referenced there was the reduction of Ms. Jangjoo's work assignments; the issue here is her signing an online petition seeking reinstatement of Mr. Dehghanpour to his hosting duties.

question about political campaigns).  Here, given the public-facing nature of *Ofogh* and the political and public significance of the topics discussed on the show, both on a global level and particularly for *Ofogh*'s audience, the petition and Ms. Jangjoo's support for it may be a matter of public concern.[5]

Furthermore, Ms. Jangjoo was not acting within her official capacity when she signed the petition.  *See Bowie*, 642 F.3d at 1133-34 (explaining that employees who make statements for their official duties are not speaking as citizens for First Amendment purposes).  She did not work on *Ofogh* and she was not claiming to sign the petition as a government employee, but as an individual citizen.  To the extent Ms. Sieg believes to the contrary, which she does not appear to do, *see* Mot. for Summ. J. 20-26, the record shows that Ms. Jangjoo signed the petition as a citizen.  For these reasons, the Court assumes for the sake of argument that Ms. Jangjoo's speech is protected by the First Amendment.

Even with the benefit of this assumption, however, Ms. Jangjoo fails to identify a genuine issue of material fact that Ms. Sieg committed a violation of Ms. Jangjoo's First Amendment rights—*i.e.*, that Ms. Sieg reduced Ms. Jangjoo's work assignments, and that this was causally linked to her signing the petition.

To begin, Ms. Sieg is not speaking in hyperbole when she observes that "[Ms.] Jangjoo's failure to grapple with the record is difficult to overstate."  Reply in Supp. of Mot. for Summ. J. 2. Ms. Jangjoo's conclusory and sometimes conflicting assertions contain little citation to the record, and when one appears, it is often a non-specific citation.  *See, e.g.*, Pl.'s Resp. to Def.'s

---

[5] Ms. Sieg argues that it does not matter that the petition "garnered a substantial number of signatures."  Mot. for Summ. J. 25.  The Court agrees that whether speech is protected by the First Amendment should not be judged based on how much attention is paid to it.  The more salient inquiry is the content of the speech—and here, the content is about who the public trusts to convey it information about the important political and cultural issues of the day.

SOMF (providing general citations to entire exhibits for some disputed facts), Pl.'s Opp. 17-18 (arguing that a causal connection existed and simply citing the depositions of two individuals in support, each of which are over 100 pages in length). This is insufficient compliance with the Federal Rule of Civil Procedure 56(c) and this District's Local Rules. *See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record"), Local Civ. R. 7(h) ("An opposition to such a motion . . . shall include references to the parts of the record relied on to support the statement.").

Wading through the record reveals that, as early as February 2015, both Ms. Jangjoo's supervisor, Mr. Kalhor, and her former supervisor, Mr. Adib, documented Ms. Jangjoo's performance as sub-par and recommended that she be placed on a two-week probationary period and "show considerable improvement" in various outlined areas. Mot. for Summ. J. Ex. 4, ECF No. 35-3 (email from Mr. Kalhor to Ms. Nixon). In mid-March, a "confusing package" that Ms. Jangjoo was responsible for producing aired that "followed no logic and was put together with total anarchy." *Id.* Ex. 6 (series of emails between, *inter alia*, Mr. Kalhor; Mohammad Manzapour, the Executive Editor of PNN; Ms. Sieg; and Ms. Nixon). Thus, issues with Ms. Jangjoo's performance arose even before the incident in question on *Ofogh* or her signing the online petition. Ms. Jangjoo fails to raise a genuine issue of material fact here because other than her self-serving statements denying these characterizations, she proffers no evidence from which a reasonable jury could infer that her supervisors' statements were inaccurate or pretextual.

The record also shows that by mid-2015, the network was acutely aware that it would be facing budgetary constraints. An email from VOA's Program Manager in May 2015 projected a

"$500k funding gap to keep everyone [contractors] you currently have on board." *Id*. Ex 10.

Another memorandum stated that VOA Persia's anticipated budget for the next fiscal year would

not sufficiently cover its costs, and that it "will be forced to either reduce the contractor costs by

30% (reducing the average number of days per month that each contractor can work from 18 to

11) or eliminate approximately 25 contract positions (out of a total of 81)." *Id*. Ex. 11, ECF No.

35-4. This message was reiterated in late July, with Mmes. Nixon and Sieg directed to "ensure

that you are only funding or purchasing items that are 'must haves' and not wish list items." *Id*.

Ex. 13. The agency's budget concerns were realized about Ms. Jangjoo when, in mid-

September, agency administrators, including Ms. Nixon, determined that the funds on

Ms. Jangjoo's contract would only last through about February 8, 2016 (a few weeks before the

end of her contract) assuming 10 assignments a month. *Id.* Ex. 15.

While management was concerned over fiscal matters, Ms. Jangjoo's first-line

supervisors experienced continued difficulties with her performance. *See* Decl. of Nicholas

Kalhor ¶ 9 (stating that he and Mr. Adib chose to reduce Ms. Jangjoo's number of assignments to

ten per month "due to her frequent absenteeism and tardiness."); Mot. for Summ. J. Ex. 43 (Dep.

of Kaveh Adib) 29:21-31:6, 38:8-39:4, ECF No. 35-7 (explaining that Ms. Jangjoo's assignments

were reduced because of her underperformance, and that he, Mr. Kalhor, and Jim Kennedy had

discussed this many times over several months leading up to November 2015).

Nothing in the record raises a genuine issue of material fact that Ms. Jangjoo's work

assignments were reduced because of her signing the petition, much less the finer point that

Ms. Sieg reduced Ms. Jangjoo's assignments because of the petition. Ms. Jangjoo admits that

she never showed the petition to Ms. Sieg, Def.'s SOMF ¶ 29, Pl.'s Resp. to Def.'s SOMF ¶ 29,

and Ms. Sieg testified that she did not read the petition or know who signed it until after this

lawsuit was filed.  Decl. of Setareh Sieg ¶ 18.  Although she received an email with a link to the

petition in July 2015, she did not click on the link or respond to the email.  *Id.* ¶ 19; *see also*

Mot. for Summ. J. Ex. 12 (email from Mr. Manzarpour to Ms. Sieg with a link to the petition and

no further text or explanation).  She also testified that Ms. Jangjoo was not the only contractor

whose assignments were reduced in November 2015: three other contractors' assignments were

reduced from 15 to 12, 10 to 6, and 16 to 12.  Decl. of Setareh Sieg ¶ 16.  Indeed, that

Ms. Jangjoo's assignments were reduced only in November 2015 although she signed the

petition in July, combined with other facts in the record, lends credence to the conclusion that

Ms. Jangjoo's assignments were reduced for legitimate reasons unrelated to her signing the

petition.  *See, e.g.*, *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing

cases finding that, in the civil rights discrimination context, a three or four month period between

an employer's knowledge of protected activity and an adverse employment action could not

establish a *prima facie* case of wrongdoing).[6]

Ms. Jangjoo has identified no evidence in the record raising a genuine issue of material

fact about whether the reduction in her work assignments was tied to her signing the petition,

instead relying on her assertion that she had a confrontational conversation with Ms. Sieg in a

hallway where Ms. Sieg allegedly said that Ms. Jangjoo's assignments were being reduced

because she signed the petition.  Pl.'s Opp. 5.  Not only does Ms. Sieg disclaim this interaction,

---

[6] Ms. Jangjoo claims—with just a general citation of a deposition to support her assertion—that
Ms. Sieg instructed an intermediary to relay a message to her in early August that Ms. Jangjoo's
assignments were being reduced to 10 monthly, but also admits that "the reduction didn't take
place before November 10, 2015." Pl.'s Opp. 17-18.  In addition to Ms. Jangjoo's admission, the
uncontroverted record—Ms. Jangjoo's timesheets—also shows that she was paid for more than
80 hours of work in September and October 2015.  Mot. for Summ. J. Ex. 29.  The evidence does
not support Ms. Jangjoo's contention that there was a short temporal proximity between her
signing the petition and the reduction of her assignments.  *See* Pl.'s Opp. 17.

but Ms. Jangjoo's allegation is unsupported by the remainder of the record, and a single self-serving statement cannot preclude summary judgment.  *See* Decl. of Setareh Sieg ¶¶ 21-22, *Arrington v. United States*, 473 F.3d 329, 343 (D.C. Cir. 2006) ("[S]ummary judgment is *most likely* when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined . . . by other credible evidence") (internal quotation marks omitted).  Instead, the record suggests that Ms. Sieg was unaware of the petition until after the relevant events occurred and deferred to others' recommendation to reduce Ms. Jangjoo's work assignments.  Ms. Jangjoo's First Amendment claim fails as a matter of law.

### D. Because No Genuine Issue of Material Fact Remains About Whether Ms. Sieg Violated Ms. Jangjoo's Assumed Constitutional Right, Ms. Sieg is Entitled to Qualified Immunity

Government officials are protected from civil damages by qualified immunity unless they "violated a federal statutory or constitutional right" and the "unlawfulness of their conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (addressing qualified immunity standard under Section 1983).  The Supreme Court recently reiterated its strong suggestion that "lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim." *Id.* at 589 n.7.  But the Supreme Court has also recognized that "the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking [in considering the question of qualified immunity] that will best facilitate the fair and efficient disposition of each case."  *Pearson v. Callahan*, 555 U.S. 223, 242 (2009).  Given the amount of judicial and government resources already dedicated to this case, and the facts of the case itself,

the Court finds it fair and efficient to address the merits of Ms. Jangjoo's First Amendment claim as an alternative to the Court's holding on the availability of a *Bivens* remedy, *see supra* Section III.B., and as a prong of the qualified immunity analysis.  The Court's analysis on causality determined that, even if signing the petition was protected First Amendment activity, Ms. Sieg has not committed a violation of a constitutional right.  Because Ms. Jangjoo thus cannot prevail on the first prong of the qualified immunity test, Ms. Sieg is therefore entitled to qualified immunity.[7]

## IV. ANALYSIS OF FIFTH AMENDMENT CLAIM

Ms. Jangjoo's Fifth Amendment claim fares no better.  Because she has no *Bivens* remedy for her claim, and because no genuine issue of material fact exists that Ms. Jangjoo was involved in barring Ms. Jangjoo from the BBG premises, Ms. Sieg is entitled to summary judgment on this claim as well.

### A.  There is No *Bivens* Remedy for Ms. Jangjoo's Fifth Amendment Claim

As discussed, *Bivens* should not be extended to cover Ms. Sieg's First Amendment claim, and that analysis generally applies to her Fifth Amendment claim as well.  *See supra* Section III.A. (discussing *Bivens* and *Abbasi*), *id.* III.B. (describing special factors counseling against extending *Bivens*, including an agency's discretion over staffing matters and an alternative remedial structure).  Thus, I separately detail here other determinations that pertain only to her Fifth Amendment claim.  *First*, Ms. Jangjoo's claim that Ms. Sieg violated her Fifth Amendment procedural due process rights by prohibiting her from entering BBG's premises and retaliatorily

---

[7]  I accordingly need not reach whether the alleged unlawfulness of the conduct was clearly established at the time.

terminating her contract is a new *Bivens* context.  *See* Am. Compl. ¶¶ 130-31, 133.  The only

currently recognized *Bivens* remedy in the Fifth Amendment context is for an allegation of

gender discrimination, *see Davis*, 442 U.S. at 231, 248-49, which Ms. Jangjoo does not make.

The present claim is therefore meaningfully different.  *See Abbasi*, 137 S. Ct. at 1859.

 *Second*, as with Ms. Jangjoo's First Amendment claim, she seeks relief on her Fifth

Amendment claim under a *respondeat superior* theory of liability, which is not a viable theory.

*See Iqbal*, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional

conduct of their subordinates under a theory of *respondeat superior*.").  Ms. Jangjoo's claim is

that Ms. Sieg unlawfully barred her from entering the BBG premises, leading to the *de facto*

termination of her contract.  But the evidence reveals that Ms. Sieg did not participate in the

discussion during which Ms. Jangjoo threatened self-harm, and Ms. Jangjoo admits as such.

Def.'s SOMF ¶¶ 66-67; Pl.'s Response to Def.'s SOMF ¶¶ 66-67.

 Instead, the record shows that a collection of individuals other than Ms. Sieg began the

decision to bar Ms. Jangjoo from the premises and Special Agent Gregory Birch in the Office of

Security issued an all-points bulletin to this effect.  *See* Mot. for Summ. J. Ex. 18 (emails

between Alfred Finch, Insider Threat Manager; Frederick Lang; Peter Lagerberg, Office of

Security; and Mr. Birch).  Ms. Sieg's involvement was restricted to the beginning and the end of

the process.  *See id*. (notifying the security team of the threat and being updated on the situation

after Ms. Jangjoo had been transported off the premises for medical evaluation).

 After the incident, Human Resources, Contracts, and Messrs. Adib and Kennedy decided

to exclude Ms. Jangjoo from the premises permanently and to terminate her contract.  Mot. for

Summ. J. Ex. 27 (email from Mr. Kennedy to Ms. Sieg stating that "Security recommended a full

bar on her and that her contract be terminated.  All agreed to this including me. . . . HR and

Contracts recommended paying her the balance [of her contract] . . . I approved this on behalf of the Division."); *Cf.* Pl.'s Opp. Ex. 15 (email from Contract Specialist stating that no termination letter was executed). Thus, because Ms. Jangjoo admits that Ms. Sieg did not have direct involvement in Ms. Jangjoo being escorted from the building for medical treatment, and because the record reflects that Ms. Sieg was not involved in Ms. Jangjoo's later bar from the premises, the only other plausible theory of liability is *respondeat superior*. This counsels against extending *Bivens* to the Fifth Amendment context at issue.

*Third*, the agency must have discretion to respond appropriately to security dangers, including threats of self-immolation, which here involved the security team's decision to restrict Ms. Jangjoo's building access and recommend against her continued employment. Mot. for Summ. J. Exs. 18, 24 (emails from Insider Threat Manager). Although Ms. Jangjoo claims that her comments was "hyperbole, typical in her culture," Pl.'s Opp. 20, and that she was being mistranslated, Mot. for Summ. J. Ex. 26, it is not this Court's role to second-guess, in hindsight, the actions of the agency contemporaneously responding to a reported security concern.[8] This also counsels against creating a *Bivens* remedy to cover Ms. Jangjoo's Fifth Amendment claim.

---

[8] Before being removed from the premises for medical treatment, Ms. Jangjoo spoke with Special Agent Karan Wright and Tisha Elliott of Human Resources and admitted in English that she had threatened self-immolation in front of the building. Mot. for Summ. J. Ex. 21 (Decl. of Karan Wright) ¶¶ 8-9, ECF No. 35-5. Agent Wright testified that it is standard procedure for an individual making a threat in a United States Government building to be removed and barred from further entry. *Id.* ¶ 10. Ms. Elliott reported that because she became concerned about Ms. Jangjoo's mental state during the meeting, she asked Ms. Jangjoo if she could get assistance for her and she agreed. Mot. for Summ. J. Ex. 39 (Decl. of Tisha Elliott) 41:3-8. Ms. Elliott then called emergency services. *Id.*

**B. There is No Genuine Issue of Material Fact About Whether Ms. Sieg Was Involved in the Decisions to Remove and Bar Ms. Jangjoo from the Premises and to Let Her Contract Lapse**

It is undisputed that Ms. Sieg was not involved in removing Ms. Jangjoo from the BBG premises. Def.'s SOMF ¶¶ 66-67; Pl.'s Response to Def.'s SOMF ¶¶ 66-67. As described in detail above, the record also shows that Ms. Sieg was not involved in the later decisions to bar Ms. Jangjoo from the building and to let Ms. Jangjoo's contract end. *See supra* Section IV.A. Ms. Jangjoo raises no genuine issue of material fact as to this question, as her only argument to refute Ms. Sieg's lack of participation in allowing Ms. Jangjoo's contract to lapse is her unsupported, conclusory statement that "Ms. Sieg did have a role." Pl.'s Resp. to Def.'s SOMF ¶ 68. This is insufficient to preclude summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(A), *Arrington*, 473 F.3d at 343.

Ms. Jangjoo also argues that her procedural due process rights were violated because she was barred from the building and *de facto* terminated without the chance to appeal these decisions. Pl.'s Opp. 20. But she puts forth no attempt to support this argument with case law. *See id.* 20-21. She also does not explain why these decisions could not be remedied through the APA when part of the relief she seeks is equitable relief to be reinstated to her former position, which would necessarily require these decisions to be amended. *See* Am. Compl. ¶ 141. In any event, the Court need not devote more attention to this question, because Ms. Jangjoo fails to identify evidence from which a reasonable jury could reasonably infer that Ms. Sieg was responsible for these decisions. Ms. Sieg is entitled to summary judgment on Ms. Jangjoo's Fifth Amendment claim as well.

## V. CONCLUSION

For all these reasons, the Defendant's Motion for Summary Judgment will be granted.  A separate order will issue.

Dated: July 13, 2018

TREVOR N. MCFADDEN, U.S.D.J.